IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JOHN DOE I, JOHN DOE II, and JOHN DOE III, § § § | |
| Plaintiffs, § § | |
| VS. § | CIVIL ACTION NO. H-05-1047 |
| § | |
| ROMAN CATHOLIC DIOCESE OF GALVESTON-HOUSTON, *et al.,* § § § | |
| Defendants. § | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs John Doe I, John Doe II, and John Doe III sued Juan Carlos Patino-Arango; the Archdiocese of Galveston-Houston, Archbishop Joseph A. Fiorenza, Monsignor William Pickard (collectively, "Archdiocese Defendants"); and Cardinal Joseph Ratzinger, now Pope Benedict XVI (referred to as "Cardinal Ratzinger" or "Pope Benedict" as appropriate), for numerous claims arising out of Patino's alleged sexual abuse of the plaintiffs in 1996. (Docket Entry Nos. 1, 29). Plaintiffs assert causes of action for breach of confidential relationships and conspiracy to breach confidential relationships, assault by offensive physical contact and conspiracy to commit sexual assault, intentional infliction of emotional distress and conspiracy to inflict such distress, fraud and fraudulent misrepresentation and conspiracy to commit fraud and fraudulent misrepresentation, sexual exploitation by a mental health services provider and conspiracy to commit sexual exploitation, fraudulent concealment and conspiracy to fraudulently conceal, negligence, negligence *per se*, negligent

1

misrepresentation involving risk of physical harm, defective premises, and gross negligence. (*Id.*). Pope Benedict has filed a motion to dismiss based on insufficiency of service of process, lack of subject-matter jurisdiction, lack of personal jurisdiction, and failure to state a claim. (Docket Entry Nos. 12, 49). Part of Pope Benedict's motion to dismiss relies on head-of-state immunity. The United States has filed a Suggestion of Immunity, (Docket Entry No. 47), which Pope Benedict has adopted, (Docket Entry No. 49). Plaintiffs have responded to the Suggestion of Immunity and moved to strike, (Docket Entry Nos. 52, 57, 61), and Pope Benedict has replied, (Docket Entry Nos. 59, 60). The Archdiocese Defendants have also filed numerous motions, which will be addressed in a separate order.

Based on the motions, pleadings, responses, and the governing law, this court grants Pope Benedict's motion to dismiss the claims against him, with prejudice. The reasons for this decision are explained below.

**I.     Background**

    **A.     The Allegations of Sexual Abuse at St. Francis de Sales Church**

According to the proposed Second Amended Complaint, in 1995, Patino, a Colombian seminarian training to become a priest, was assigned by the Archdiocese to Francis de Sales Church in Houston, Texas. (Docket Entry No. 28, Ex. 1, ¶ 2.01). In this position, Monsignor Pickard had day-to-day supervision over Patino, who conducted Mass, administered Communion, counseled parishioners, heard confessions, and oversaw the church's altar boy program. (*Id.*). In 1995, John Doe I was in eighth grade. (*Id.* at ¶ 2.02). He attended school at the church and served as an altar boy. In May of 1996, Patino allegedly summoned Doe

I to the rectory under the pretext of counseling and sexually abused him. Patino allegedly told Doe I not to report the abuse because no one would believe him, explaining that he held similar "counseling sessions" with numerous boys from the parish. Doe I was allegedly afraid and confused by what occurred and so traumatized that he told his parents about the abuse. (*Id.*). Doe I's parents allegedly went to the Archdiocese to report the abuse. Monsignor Pickard and Father Steven Tieman, another Diocesan official, allegedly went to Doe I's home, told Doe I and his parents that the matter would be investigated, and assured the family that Patino would be removed. (*Id.*). According to plaintiffs, the Archdiocese failed to report the incident to either Child Protective Services or the Houston Police Department and hid Patino in a "retreat house for abusive priests in Houston." Plaintiffs allege that during Patino's stay at the "safe house," he admitted to molesting Doe I and other boys at the church. Despite this information, plaintiffs allege that the Archdiocese aided in Patino's exit from the country as a fugitive from this and other crimes. (*Id.*). Plaintiffs further allege that the Archdiocese and the individually-named defendants failed to inform any of the parishioners of the boy's report or that Patino admitted to the crimes, instead purposely covering up the events. (*Id.*). Plaintiffs further allege that shortly before filing this suit, they learned that Patino is living in Florida but has not faced legal sanction for his actions. (*Id.*).

John Doe II's allegations are similar. Doe II was in eighth grade in 1995 when he met Patino. (*Id.* at ¶ 2.03). Doe II's family attended St. Francis, and Doe II was sent to the rectory for counseling at Patino's request while his mother attended a prayer group meeting.

(*Id.*). Patino allegedly held himself out as a counseling professional to Doe II's family, claiming that he had a degree in counseling and was an expert in "counseling" boys. (*Id.*). On two separate occasions in 1996, Patino allegedly sexually abused Doe II during "counseling" sessions. (*Id.*). As with Doe I, Patino allegedly urged Doe II not to tell anyone about the incidents. Doe II remained silent. (*Id.*).

John Doe III is the half-brother of John Doe II and was eleven or twelve years old when he first met Patino. (*Id.* at ¶ 2.04). Doe III alleges that, like his brother, he was sent to Patino for what was billed as "professional counseling" while his mother attended her prayer group. (*Id.*). On at least one occasion in 1996, Patino allegedly sexually abused Doe III. (*Id.*). Specifically, Doe III alleges that during a "counseling" session, Patino showed Doe III his academic credentials, explained that he was a counselor, asked Doe III to undress, became angry when Doe III initially refused, and, after Doe III relented, sexually abused him. (*Id.*). Doe III alleges that Patino told him not to tell anyone else of the incident and boasted of engaging in similar behavior with other boys in the church. (*Id.*). Like his half-brother, Doe III did not tell anyone about this alleged abuse. (*Id.*).

Plaintiffs allege that Archbishop Fiorenza assisted Patino in his flight from Texas to avoid investigation and prosecution for sexual abuse and to conceal the conspiratorial conduct of the Archbishop, the Archdiocese, and Monsignor Pickard in covering up the abuse. (*Id.* at ¶ 2.08). Plaintiffs allege that the Archdiocese Defendants knew of Patino's abusive propensities, yet "cloaked him with the authority of a parish assignment which placed the minor boys of St. Francis de Sales at risk of sexual abuse." (*Id.* at ¶ 2.11).

Plaintiffs allege that instead of warning the parishioners of the danger Patino posed or reporting the incidents to law enforcement, as required, the Archdiocese Defendants allegedly concealed his crimes and aided Patino in evading law enforcement. (*Id.* at ¶¶ 2.11, 2.16). Plaintiffs allege that this cover-up comported with directives from the Vatican.

> **B.  The Allegations as to the Involvement of the Congregation for the Doctrine of the Faith**

Plaintiffs contend that the Congregation for the Doctrine of the Faith, formerly known as the Holy Office of the Vatican, played a central role in the alleged conspiracy to conceal Patino's sexual abuse. (Docket Entry No. 28, Ex. 1, ¶ 2.17). In 1962, this office, recently headed by defendant Pope Benedict, published the *Crimen Sollicitationis*, or "Manner of Proceeding in Cases of Solicitation," which went to every archdiocese in the world, including the Archdiocese of Galveston-Houston. (*Id.*). According to plaintiffs, the "*Crimen* is a virtual 'trial manual' on the manner of conducting secret, exculpatory, sham-trials of priest-perpetrators in such a manner as to denigrate the victim's testimony through a series of self-incriminating leading questions that make it virtually impossible for any priest ever to be convicted of the crime of sexual assault of children by a secret church tribunal. Instead, the criminal perpetrator is to be sent on his way to conduct pious pilgrimages while the victim is silenced under a papal secret, never to reveal the conduct of the proceeding for fear of eternal damnation." (*Id.*). In a letter dated May 18, 2001, Cardinal Ratzinger allegedly referred to the *Crimen*, the existence and meaning of which are disputed, thereby confirming "that the procedures of *Crimen* have been in effect and known to Bishops such as the

Fiorenza defendant in this case from at least 1962 to 2001, most likely earlier. . . ." (*Id.*). Plaintiffs allege that the *Crimen* demonstrates that the Catholic Church has a long history of sexual abuse by priests against young boys, a history known to the Archdiocese Defendants long before the alleged incidents. (*Id.* at ¶¶ 2.20–2.22). Additionally, plaintiffs allege that this document demonstrates an ongoing conspiracy, fraud, fraudulent concealment, misrepresentation, and conspiracy to commit and conceal the fact that members of the clergy sexually abused minors by the Catholic hierarchy, including the defendants in this case. (*Id.* at ¶ 2.20).

Plaintiffs allege that the letter Cardinal Ratzinger authored in 2001 "is conspiratorial on its face" in that it reminds the archdioceses that clerical sexual assault of minors is subject to exclusive clerical control and "pontifical secrecy," controls and keeps secret the records of these proceedings, and "extends [the Church's] period of exclusive control and secrecy in the criminal matters to the age of the victim as age 18 plus ten years in order to defeat intentionally most criminal statutes of limitations." (Docket Entry No. 28, Ex. 1, ¶ 2.27 & Ex. A). Plaintiffs further allege that Archbishop Fiorenza participated in an additional, related conspiracy in his previous position as bishop of the Archdiocese of San Angelo, Texas. (Docket Entry No. 28, Ex. 1, ¶ 2.28). Then-Bishop Fiorenza allegedly helped move an allegedly criminal priest, David Holly, from Massachusetts to San Angelo without informing any of the San Angelo parishioners of the priest's past. (*Id.*). According to plaintiffs, Archbishop Fiorenza subsequently moved Holly to New Mexico, where he is serving a 200-plus year prison sentence for child sexual abuse. (*Id.*). Additionally, plaintiffs

allege that Archbishop Fiorenza, through his position as Vice-President and then president of the National Council of Catholic Bishops, received specific knowledge about the "widespread nature of criminal conduct involved" within the Church. (*Id.* at ¶ 2.29).

Finally, plaintiffs allege that Pope Benedict and the Catholic Church, including the Defendant Archdiocese, continue to conceal sexual crimes committed by priests. Plaintiffs allege that Cardinal Ratzinger wrote a letter in the summer of 2002 reminding United States bishops that, although the Church supported the general notion of cooperating with civil authorities in cases of alleged child sexual abuse, "the Church reaffirms her right to enact legislation binding on all her members concerning the ecclesiastical dimensions of the delict of sexual abuse of minors." (*Id.* at ¶ 2.30). According to plaintiffs, this letter, combined with the *Crimens* and other proclamations by Pope Benedict, further demonstrates the ongoing conspiracy that both victimized plaintiffs and prevented them from filing this lawsuit earlier.

This memorandum and opinion analyzes Pope Benedict's motion to dismiss.

## II. The Governing Legal Standards

### A. Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) governs challenges to a court's subject matter jurisdiction. "A case is properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996)). "Courts may dismiss for lack of subject matter jurisdiction on any one of three bases: (1) the complaint

alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)). The plaintiff bears the burden of demonstrating that subject-matter jurisdiction exists. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). In examining a factual challenge to subject matter jurisdiction under Rule 12(b)(1), which does not implicate the merits of plaintiff's cause of action, the district court has substantial authority "to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir. 1997); *see also Clark*, 798 F.2d at 741. The court may consider matters outside the pleadings, such as testimony and affidavits. *See Garcia*, 104 F.3d at 1261.

### B. Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief may be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) dismissal is appropriate only if there is no set of facts that could be proven consistent with the complaint allegations that would entitle the plaintiff to relief. *Scanlan v. Texas A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). The court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Id.* In order to avoid dismissal for failure to state a claim, however, a plaintiff must plead specific facts, not mere conclusory allegations. *Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003). This court "will thus not accept as true conclusory allegations or unwarranted deductions of fact." *Id.* (quoting *Collins*

*v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)). In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings, including attachments thereto. *Collins*, 224 F.3d at 498.

### III. Head-of-State Immunity

The Suggestion of Immunity filed by the United States and Pope Benedict's motion to dismiss this lawsuit against him on the basis of head-of-state immunity challenge this court's subject-matter jurisdiction. Because it is axiomatic that a court may not proceed in the absence of jurisdiction, this claim is appropriately considered first.

The doctrine of head-of-state immunity is applied in the United States as a matter of customary international law and as an incident of the executive branch's authority in the field of foreign affairs. The Supreme Court first recognized this doctrine in *The Schooner Exchange v. M'Faddon*, 11 U.S. (7 Cranch) 116 (1812). This case, which held that an armed ship of a friendly state was not subject to jurisdiction in the United States, "came to be regarded as extending virtually absolute immunity to foreign sovereigns." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983). Although the absolute immunity of foreign states has been affected by case law and by passage of the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602 *et seq.*, the State Department retains the authority to assert immunity for diplomatic personnel, including foreign heads of state. *See* 22 U.S.C. § 254a–e; House Rep. No. 94-1487, 94th Cong., 2d Sess. 12 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6610. Federal courts have continued to hold that foreign heads of state retain absolute immunity from suit in American courts. *See, e.g.*, *Ye v. Zemin*, 383 F.3d 620,

625 (7th Cir. 2004); *Alicog v. Kingdom of Saudi Arabia*, 860 F. Supp. 379, 382 (S.D. Tex. 1994), *aff'd*, 79 F.3d 1145 (5th Cir. 1996).

Under long-established procedure, the executive branch makes a determination to grant immunity to a head of state sued in the United States and then files a suggestion of immunity with the court.[1] "[O]nce the State Department has determined that immunity is warranted, and has submitted that ruling to the court through a suggestion, the matter is for diplomatic rather than judicial resolution. The suit must be dismissed." *Spacil*, 617 F.2d at 617 (citing *Isbrandtsen Tankers, Inc. v. President of India*, 446 F.2d 1198 (2d Cir. 1971); *Rich v. Naviera Vacuba*, 295 F.2d 24 (4th Cir. 1961)). The executive's determination is not subject to additional review by a federal court. A court may not inquire into whether the State Department followed its own internal procedures. *Spacil*, 617 F.2d at 617 (citing *Ex Parte Peru*, 318 U.S. 578, 589 (1943)). After a suggestion of immunity is filed, it is the "court's duty" to surrender jurisdiction. *Ex Parte Peru*, 318 U.S. at 588.

Judicial willingness to withdraw from any review over this unilateral executive determination has long and deep constitutional roots. *See Rich*, 295 F.2d at 26. As the Supreme Court discussed in *Baker v. Carr*, 369 U.S. 186, 211 (1962), the justiciability doctrine limits — and in some cases, prohibits — federal courts from hearing suits that could impact authority explicitly given to a coordinate branch of government by the Constitution. *Id.* at 210–11. The field of foreign affairs contains numerous examples of areas of control

---

[1] *See Spacil v. Crowe*, 489 F.2d 614, 615 n.2 (5th Cir. 1974) (describing the procedures by which the State Department and the Office of the Legal Adviser make this determination).

wholly within the executive branch.  *See, e.g.*, *Goldwater v. Carter*, 444 U.S. 996 (1979) (holding a senator's challenge to the president's decision to withdraw from a treaty nonjusticiable); *United States v. Curtiss-Wright Corp.*, 299 U.S. 304, 315 (1936) (finding a challenge to the executive's interpretation of a treaty obligation nonjusticiable on the ground that the resolution at issue affected "a situation entirely external to the United States, and . . . within the category of foreign affairs").  Although not every case impacting foreign affairs is nonjusticiable, cases involving foreign heads of state are routinely found nonjusticiable or justiciable but subject to absolute immunity for the foreign heads of state.  *Compare Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) (finding a challenge to the president's reliance on his Article II powers to seize steel mills both justiciable and unconstitutional); *Dames & Moore v. Regan*, 453 U.S. 654 (1981) (addressing and upholding the constitutionality of the president's use of executive agreements instead of treaties to implement a foreign policy agreement) *with, e.g.*, *Ex Parte Peru*, 318 U.S. at 588.  Although courts often determine questions of foreign-sovereign immunity when the executive branch does not explicitly recognize a claim of immunity and suggest that immunity to the court, "when the executive has made its determination clear," there is no room for judicial inquiry. *See Rich*, 295 F.2d at 618–19 (citing and discussing *Mexico v. Hoffman*, 324 U.S. 30, 35 (1945); *Ex Parte Peru*, 318 U.S. at 75; Scharf, *Judicial Review and the Political Question: A Functional Analysis*, 75 YALE L.J. 517, 541–48 (1966)).  This approach to foreign sovereign immunity is further supported by the well-recognized differences in competence and accountability between the judicial and executive branches in the area of foreign policy.

11

*See Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions . . . are delicate, complex, and involve large amounts of prophecy. . . .They are decisions of a kind for which the Judiciary has neither aptitude nor facilities nor responsibility.").

In this case, the United States, through its Suggestion of Immunity and letter from the Department of State Legal Adviser, has explicitly requested that Cardinal Ratzinger, now Pope Benedict XVI and the head of the Holy See, be dismissed from this lawsuit on the basis of head-of-state immunity. Judicial review of this determination is not appropriate.

Plaintiffs nonetheless argue that Pope Benedict has somehow waived his immunity defense by consenting to the removal of this lawsuit from state to federal court. In support of this argument, plaintiffs cite to Supreme Court authority on waiver of states' sovereign immunity under the Eleventh Amendment, including *Lapides v. Bd. of Regents*, 535 U.S. 613, 621 (2002), and *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666 (1999). Head-of-state immunity and the sovereign immunity of the states making up the United States arise from distinct constitutional and historical roots. The sovereign immunity enjoyed by individual states of the United States is rooted in notions of federalism, separation of powers, and comity. *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267–68 (1997) ("To respect the broader concept of immunity, implicit in the Constitution, which we have regarded the Eleventh Amendment as evidencing and exemplifying, we have extended a State's protection from suit to suits brought by the State's own citizens."); *Gregory v. Ashcroft*, 501 U.S. 452, 457, 460 (1991) (O'Connor, J.) ("As

every schoolchild learns, our Constitution establishes a system of dual sovereignty between the States and the Federal Government. . . . Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign."); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring) ("Federalism was our Nation's own discovery. The Framers split the atom of sovereignty. It was the genius of their idea that our citizens would have two political capacities, one state and one federal, each protected from incursion by the other. The resulting Constitution created a legal system unprecedented in form and design, establishing two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it."). Head-of-state immunity, by contrast, is linked to the executive's Article II powers. Determinations of a state's assertion of sovereign immunity and whether it has been waived are for a court, based on review of specific facts. *See, e.g.*, *Tennessee v. Lane*, 541 U.S. 509 (2004); *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2003); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996); *Parden v. Terminal Ry. of Ala. Docks Dep't*, 377 U.S. 184 (1964). By contrast, the determination of whether head-of-state immunity exists rests with the executive branch, which is charged with the responsibility over foreign relations. *See Goldwater*, 444 U.S. at 537–38 (Rehnquist, J., concurring) (distinguishing the line of nonjusticiable cases implicating the executive's foreign relations power with justiciable cases that incidentally impact the foreign relations power but involve internal disputes); *Curtiss-Wright Export Corp.*, 299 U.S. at 316–17 ("[S]ince the states severally never possessed international powers, such powers

could not have been carved from the mass of state powers but obviously were transmitted to the United States from some other source. . . . Even before the Declaration [of Independence], the colonies were a unit in foreign affairs, acting through a common agency — namely, the Continental Congress, composed of delegates from the thirteen colonies. . . . 'The states were not 'sovereigns' in the sense contended for by some. They did not possess the peculiar features of sovereignty — they could not make war, nor peace, nor alliances, nor treaties.'" (quoting 5 ELLIOT'S DEBATES, 212)).

The State Department has determined that head-of-state immunity applies to Pope Benedict. Nothing in the removal of this suit from state to federal court affects that determination nor makes judicial review of it appropriate.

Plaintiffs also allege that Cardinal Ratzinger exceeded the authority granted him by Pope John Paul II in engaging in some of the acts alleged in this lawsuit. (Docket Entry No. 28, Ex. 1, ¶¶ 1.08, 2.27). Plaintiffs appear to raise an argument that would be relevant to a qualified immunity analysis, such as that used in assessing whether state actors sued under 42 U.S.C. § 1983 may be held liable for their individual conduct that violates federally-protected rights. *See Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738 (1985) (permitting suits against state officers, but not states themselves). Through this analysis, a state official who exceeds his authority and violates the constitutional rights of a plaintiff may be held liable for damages even if the state itself may not. This argument fails for many of the same reasons that the Eleventh Amendment-based waiver argument fails: head-of-state immunity is fundamentally different from both the Eleventh Amendment and qualified

immunity. To the extent this pleading attempts to allege that Cardinal Ratzinger exceeded his consular authority and therefore lacks diplomatic immunity, as if under the FSIA, the argument is misplaced. The FSIA does not apply to foreign heads of state such as Pope Benedict, who are entitled to absolute immunity from suit without further inquiry by a domestic court. *Cf.* 22 U.S.C. § 254a–e; *Ye*, 383 F.3d at 620. Plaintiffs' claim that Cardinal Ratzinger exceeded the authority granted him by former Pope John Paul II is irrelevant to the head-of-state immunity determination.

Plaintiffs rely heavily on *Clinton v. Jones*, 520 U.S. 681 (1997), to support their claim that Pope Benedict can be haled into federal court. This case, which involved civil litigation against a sitting president of the United States, is inapposite for several reasons. First, *Clinton v. Jones* involved a dispute between two private American citizens, one of whom happened to be president. As noted in the comparison between state sovereign immunity and head-of-state immunity, the distinction between a court's role in internal, domestic matters and in issues of foreign affairs is longstanding and significant. Moreover, as the Supreme Court explained, requiring President Clinton to submit to discovery in a civil lawsuit against him did not provoke separation of powers concerns. The Court emphasized that "in this case there is no suggestion that the Federal Judiciary is being asked to perform any function that might in some way be described as 'executive.' . . . Whatever the outcome of this case, there is no possibility that the decision will curtail the scope of the official powers of the Executive Branch." *Id.* at 701. In contrast, by asking this court to assert jurisdiction over Pope Benedict, head of the Holy See, plaintiffs ask this court to violate the separation of powers

by raising the potential of impinging the executive branch's authority over foreign affairs. In *Clinton v. Jones*, the Court drew on history to support its conclusion that requiring a president to submit to judicial process was a longstanding tradition that did not interfere with the separation of powers. The history of head-of-state immunity points in the opposite direction. American courts have honored and consistently applied head-of-state immunity for two centuries. Nothing in *Clinton v. Jones* supports a contrary view of this jurisprudence.

Plaintiffs also argue that because they sued Pope Benedict for acts performed when he was a Cardinal, head-of-state immunity is inappropriate because he is now the Pope. Courts have consistently applied the related doctrines of diplomatic immunity and foreign-sovereign immunity in cases in which the individual or entity did not have sovereign status at the time the plaintiff filed suit. *See Abdulaziz v. Metro. Dade County*, 741 F.2d 1328, 1329–30 (11th Cir. 1984) (holding that "diplomatic immunity flowing from [State Department-conferred diplomatic] status serves as a defense to suits already commenced"); *Straub v. A P Green, Inc.*, 38 F.3d 448, 451 (9th Cir. 1994) (holding that foreign-sovereign immunity "applies when a party is a foreign state at the time the lawsuit is filed, even if that party was not a foreign state at the time of the alleged wrongdoing"). The principles underlying head-of-state immunity apply even if the foreign sovereign had a different status at the time of the alleged acts or the time the lawsuit is filed.

Plaintiffs further contend that Pope Benedict and the United States have not raised the defense of absolute immunity sufficiently by filing the Suggestion of Immunity on behalf of Pope Benedict, Head of the Holy See, instead of on behalf of Pope Benedict, Head of the

Vatican City State. As the Fifth Circuit noted in *Spacil*, once the State Department has filed a Suggestion of Immunity, judicial inquiry into the formalities and procedures used is improper. 617 F.2d at 617 (citing *Ex Parte Peru*, 318 U.S. at 589). A brief review of readily-available sources shows that the Holy See is the appropriate political title.[2] The Suggestion of Immunity correctly identified defendant Ratzinger as Pope Benedict XVI, head of a foreign state, the Holy See. The Suggestion of Immunity ends this court's inquiry, regardless of the manner in which plaintiffs have pleaded their claims against Pope Benedict.

Pope Benedict's motion to dismiss based on head-of-state immunity is granted, with prejudice.[3]

### IV.   Conclusion

Pope Benedict's motion to dismiss all claims against him is granted on the basis of this court's recognition of head-of-state immunity. The motions pending against Pope Benedict are denied.

---

[2] *See, e.g.*, Council of American Ambassadors, *United States-Vatican Diplomatic Relations: The Past and The Future*, *available at* http://www.americanambassadors.org/index.cfm?fuseaction=Publications.article&articleid=44 (last visited Dec. 21, 2005) ("On January 10, 1984, when President Reagan announced the establishment of formal diplomatic relations with the *Holy See* . . .") (emphasis added); *Independent States in the World*, United States State Department Fact Sheet, *available at* http://www.state.gov/s/inr/rls/4250.htm (last visited Dec. 21, 2005) (listing Holy See); *Background Note: Holy See*, United States Department of State Bureau of European and Eurasian Affairs, October 2005, *available at* http://www.state.gov/r/pa/ei/bgn/3819.htm (last visited Dec. 21, 2005) (listing "Holy See" as the official state name).

[3] This resolution of the motion to dismiss makes it unnecessary to address the additional grounds offered for dismissal.

The other parties' outstanding motions will be addressed by a separately-issued memorandum and opinion.

SIGNED on December 22, 2005, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge