**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JOHN DOE I,  JOHN DOE II, and | § | |
| JOHN DOE III, | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-05-1047 |
| | § | |
| ROMAN CATHOLIC DIOCESE OF | § | |
| GALVESTON-HOUSTON, *et al.,* | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

Plaintiffs John Doe I, John Doe II, and John Doe III have sued the Archdiocese of Galveston-Houston; Juan Carlos Patino-Arango, who at the relevant time was a seminarian training to be a priest; Joseph A. Fiorenza, then Bishop of the Diocese; William Pickard, then Monsignor of the parish; and Cardinal Joseph Ratzinger, then the prefect of the Congregation for the Doctrine of Faith and now Pope Benedict XVI.  The plaintiffs are young men who allege that in 1996, when they were children, Patino used his position as a clergy member assigned to their church to sexually assault them.  (Docket Entry Nos. 1, 29).  The plaintiffs assert state-law causes of action for intentional torts, including breach of confidential relationships, assault by offensive physical contact, intentional infliction of emotional distress, fraud and fraudulent misrepresentation, sexual exploitation by a mental health services provider, fraudulent concealment, and conspiracy to commit each of these torts.  The plaintiffs also assert causes of action for negligence, including negligence *per se*, negligent

misrepresentation involving risk of physical harm, defective premises, and gross negligence. (*Id.*).

In a previous Memorandum and Order, this court granted Pope Benedict's motion to dismiss on the basis of head-of-state immunity. (Docket Entry No. 62). This Memorandum and Opinion addresses motions to dismiss the complaint filed by the Archdiocese of Galveston-Houston, Archbishop Joseph A. Fiorenza, and Monsignor William Pickard (collectively, "the Archdiocese Defendants"). (Docket Entry Nos. 7, 9). The plaintiffs have responded to the motions to dismiss, (Docket Entry No. 33), and the Archdiocese Defendants have replied, (Docket Entry Nos. 40, 41). The plaintiffs have also moved for leave to file a proposed Second Amended Complaint (Docket Entry No. 28) and a Supplemental Pleading (Docket Entry No. 30), both of which the Archdiocese Defendants oppose, (Docket Entry No. 36). The plaintiffs have named Patino as a defendant but have not served him with process.

Based on the motions, pleadings, responses, and the governing law, this court grants the motion to dismiss the intentional tort causes of action—assault by offensive physical contact, intentional infliction of emotional distress, breach of confidential or fiduciary relationships, and the related conspiracy claims—and certain of the negligence claims—gross negligence and negligence *per se*—and denies the motion for leave to amend and supplement with respect to these claims. This court denies the motion to dismiss the claims that the Archdiocese Defendants' negligence and gross negligence allegedly allowed Patino's abuse to occur and continue and for liability based on the allegation that the abuse was by a

purported mental-health services provider and grants the motion for leave to amend and supplement as to these claims.  The reasons for these decisions are explained in detail below.

## I.      Background

According to the proposed Second Amended Complaint, in 1995, the Archdiocese of Houston-Galveston assigned Patino, a Colombian seminarian training to become a priest, to the Francis de Sales Church in Houston, Texas.  (Docket Entry No. 28, Ex. 1, ¶ 2.01).  Monsignor Pickard had day-to-day supervision over Patino's work in this position.  The jobs assigned to Patino included conducting Mass, administering Communion, counseling parishioners, hearing confessions, and overseeing the church's altar-boy program.  (*Id.*).

In 1995, John Doe I was in eighth grade.  (*Id.* at ¶ 2.02).  He attended school at the church and served as an altar boy.  In the proposed Second Amended Complaint, the plaintiffs allege that in May 1996, Patino summoned Doe I to the rectory under the pretext of counseling him.  Instead, Patino sexually abused Doe I.  Patino allegedly told Doe I not to tell anyone and warned that no one would believe him if he did.  Patino allegedly explained that he held similar "counseling sessions" with many boys from the parish.  Despite the warning and feelings of fear and confusion, Doe I told his parents, who went to the Archdiocese to report the abuse.  Monsignor Pickard and Father Steven Tieman, another Diocesan official, allegedly assured Doe I and his parents that the matter would be investigated and Patino would be removed from the church.  (*Id.*).  According to plaintiffs, the Archdiocese failed to report the incident to either Child Protective Services or the Houston Police Department and instead hid Patino in a "retreat house for abusive priests in

3

Houston."  Plaintiffs allege that during Patino's stay at the "safe house," he admitted to molesting Doe I and other boys at the church.  Despite this information, the Archdiocese allegedly helped Patino leave the country as a fugitive from this and other crimes.  (*Id.*).  The plaintiffs further allege that the Archdiocese and the individually-named Archdiocese Defendants did not tell parishioners about Doe I's report or Patino's admission, instead purposely concealing the information.  (*Id.*).  The plaintiffs allege that shortly before filing this suit, they learned that Patino is again living in this country but still has faced no legal consequences for his actions.  (*Id.*).

John Doe II's allegations are similar.  Doe II was in eighth grade in 1995 when he met Patino.  (*Id.* at ¶ 2.03).  Doe II's family also attended St. Francis.  Patino asked Doe II's parents to send the boy to the rectory for counseling while his mother attended a prayer group meeting.  (*Id.*).  Patino allegedly represented himself to Doe II's family as a counseling professional, claiming that he had a degree in counseling and was an expert in helping boys. (*Id.*).  On two separate occasions in 1996, Patino allegedly sexually abused Doe II during "counseling" sessions.  (*Id.*).  Patino warned Doe II not to tell anyone about the incidents; unlike Doe I, Doe II remained silent.  (*Id.*).

John Doe III is Doe II's half-brother and was eleven or twelve years old when he first met Patino.  (*Id.* at ¶ 2.04).  Doe III alleges that, like his brother, he was sent to Patino for what was billed as "professional counseling" while his mother met with her prayer group.  (*Id.*).  Patino allegedly sexually abused Doe III at least once in 1996.  (*Id.*).  During a "counseling" session, Patino showed Doe III what he described as his academic credentials,

explained that he was a counselor, and asked Doe III to undress.  Doe III allegedly initially refused but acquiesced after Patino became angry.  Patino then sexually abused Doe III and told him not to tell, boasting of similar behavior with other boys in the church.  (*Id.*).  Like his half-brother, Doe III did not tell anyone what had happened.  (*Id.*).

The plaintiffs allege that Archbishop Fiorenza helped Patino flee Texas and avoid prosecution for the sexual abuse, allowing the Archdiocese Defendants to conceal both the abuse and their own cover-up.  (*Id.* at ¶ 2.08).  The plaintiffs allege that the Archdiocese Defendants knew about Patino's abusive propensities but "cloaked him with the authority of a parish assignment which placed the minor boys of St. Francis de Sales at risk of sexual abuse."  (*Id.* at ¶ 2.11).  The plaintiffs allege that instead of warning parishioners about the danger Patino posed for their sons or reporting the incidents to authorities as the law required, the Archdiocese Defendants instead concealed Patino's actions and helped him avoid investigation, prosecution, and punishment.  (*Id.* at ¶¶ 2.11, 2.16).  The plaintiffs allege that this cover-up carried out general directives from the Vatican itself.

The primary bases for the Archdiocese Defendants' motions to dismiss and opposition to the plaintiffs' motion for leave to amend and supplement are that the statute of limitations bars the claims and that the plaintiffs have failed to allege necessary elements for recovery. Each ground is analyzed below.

## II.     The Governing Legal Standards

### A.     Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief may be granted."  FED. R. CIV. P. 12(b)(6).  Rule 12(b)(6) dismissal is appropriate only if there is no set of facts that could be proven consistent with the complaint allegations that would entitle the plaintiff to relief.  *Scanlan v. Texas A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).  The court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff.  *Id.*  To avoid dismissal for failure to state a claim, however, a plaintiff must plead specific facts, not mere conclusory allegations.  *Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003).  A court "will thus not accept as true conclusory allegations or unwarranted deductions of fact."  *Id.* (quoting *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)).  In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings, including attachments thereto.  *Collins*, 224 F.3d at 498.  If an affirmative defense or other barred relief (such as absolute immunity or statute of limitations) is apparent from the face of the complaint, a motion under Rule 12(b)(6) should be granted.  5B Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE Civil 3d § 1357, at 708 (2004).

### B.      Rule 15

Rule 15 of the Federal Rules of Civil Procedure requires leave of the court for a party to file an amended pleading and provides that such leave "shall be freely given when justice so requires."  In deciding whether to grant leave to file an amended pleading, a district court may consider factors such as undue delay; bad faith or dilatory motive on the part of the movant; repeated failure to cure deficiencies by amendments previously allowed; undue prejudice to the opposing party; and futility of amendment.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993).  Leave to amend under Rule 15(a) "shall be freely given when justice so requires," but  "is by no means automatic."  *Little v. Liquid Air Corp.*, 952 F.2d 841, 845–46 (5th Cir. 1992); *Addington v. Farmer's Elevator Mut. Ins. Co.*, 650 F.2d 663, 666 (5th Cir. 1981); *Layfield v. Bill Heard Chevrolet Co.*, 607 F.2d 1097, 1099 (5th Cir. 1979).  The decision "lies within the sound discretion of the district court."  *Little*, 952 F.2d at 846.

### III.    The Motions for Leave to Amend and Supplement

The plaintiffs have filed a motion for leave to amend their complaint and a motion for leave to file a supplemental pleading.  (Docket Entry Nos. 28, 30).  The Archdiocese Defendants' primary opposition is that even as amended, the claims fail, making the amendments futile.  To the extent this court grants the motions to dismiss because of deficiencies that cannot be remedied through repleading, leave to amend or supplement is denied because the amended and supplemented pleading would be futile.  To the extent the motions to dismiss are denied, the motions for leave to amend and supplement are granted.

The Archdiocese Defendants have not shown that the proposed amended or supplemented pleading as to these claims is futile, the product of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or would unduly prejudice the opposing party.

## IV.    The Archdiocese Defendants' Motions to Dismiss

### A.    The Intentional Tort and Breach of Fiduciary Duty Claims

The Archdiocese Defendants move to dismiss the claims for assault, intentional infliction of emotional distress, breach of fiduciary duty, and conspiracy on the basis of limitations and failure to state a claim.  Because this court concludes that the plaintiffs have not alleged a basis to impose vicarious liability against the Archdiocese Defendants for Patino's intentional torts or to impose liability for breach of fiduciary duty, the motion to dismiss is granted for failure to state a claim.[1]

An employer is not vicariously liable for an employee's intentional torts unless the employee commits the intentional tort (1) within the scope of his employment, (2) in furtherance of the employer's business, and (3) to accomplish the object for which the employer hired the employee.  *Minyard Food Stores v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002).  In a case that involved similar allegations that a clergy member sexually abused parishioners, the Fifth Circuit rejected a claim that sexual abuse was within the scope of a priest's employment.  *See Tichenor v. Roman Catholic Church of the Archdiocese of New*

---

[1]  Because the plaintiffs have failed to state valid intentional tort claims against the Archdiocese Defendants, this court will not address whether limitations would also bar those claims.

*Orleans*, 32 F.3d 953, 959 (5th Cir. 1994) ("We reject the contention that [the priest] was acting within the scope of his employment. . . . It would be hard to imagine a more difficult argument than that [the priest's] illicit sexual pursuits were somehow related to his duties as a priest or that they in any way furthered the interests of St. Rita's, his employer."). Although that case involved Louisiana law, the same result applies under the Texas law governing vicarious liability of an employer for an employee's intentional torts. *Minyard Food Stores*, 80 S.W.3d at 577. Patino's intentional torts cannot be imputed to the Archdiocese Defendants because his conduct was not, as a matter of law, related to his duties as a priest and did not further the interests of his employer.

Nor can the Archdiocese Defendants be vicariously liable for Patino's conduct because they owed fiduciary obligations to the plaintiffs or be held liable for breaching fiduciary duties themselves. Texas does not recognize a fiduciary relationship between a clergy member and a parishioner. *Hawkins v. Trinity Baptist Church*, 30 S.W.3d 446, 452–53 (Tex. Ct. App. – Tyler 2000, no writ.). In the absence of such a relationship, the plaintiffs cannot hold the Archdiocese Defendants vicariously or directly responsible for Patino's intentionally tortious sexual abuse.

The Archdiocese Defendants' motion to dismiss the intentional tort claims is granted.

**B.**     **The Negligence, Negligence *Per Se*, Gross Negligence, and Defective Premises Claims**

>    *1.     The Statute of Limitations*

The Archdiocese Defendants contend that the Texas two-year limitations period for personal-injury actions bars the plaintiffs' claims and that no tolling theory applies.  (Docket Entry Nos. 5 at 4, 6; 40 at 14).   The plaintiffs respond that a five-year limitations period applies and that the complaint alleges grounds for tolling.  (Docket Entry No. 34).

Section 16.003(a) of the Texas Civil Practice and Remedies Code establishes a two-year statute of limitations for personal-injury claims.  If a plaintiff was under eighteen when the injury occurred, limitations is tolled until the plaintiff's eighteenth birthday.  TEX. CIV. PRAC. & REM. CODE § 16.001.  John Doe I was born on July 14, 1981.  (Docket Entry No. 5, Ex. 1).  John Doe II was born on April 7, 1982.  (*Id.*, Ex. 2).  John Doe III was born on September 7, 1984.  (*Id.*, Ex. 3).  The statute of limitations began to run on July 14, 1999 for Doe I, April 7, 2000 for Doe II, and September 7, 2002 for Doe III.  Doe I and Doe II filed suit on June 2, 2004, more than two years after they turned eighteen.  Doe III filed suit on October 4, 2004, also more than two years after his eighteenth birthday.  Accordingly, the statute of limitations bars plaintiffs' personal-injury claims unless a longer limitations period or a basis for tolling applies.

The plaintiffs claim that the five-year statute of limitations for sexual abuse claims found in Texas Civil Practice and Remedies Code Section 16.0045(a) applies to the claims against the Archdiocese Defendants.  Section 16.0045(a) reads:

10

> A person must bring suit for personal injury not later than five
> years after the day the cause of action accrues if the injury arises
> as a result of conduct that violates:
>
> (1) Section 22.011, Penal Code (sexual assault); or
>
> (2) Section 22.021, Penal Code (aggravated sexual assault).

TEX. CIV. PRAC. & REM. CODE § 16.0045(a). In the proposed Second Amended Complaint, the plaintiffs allege that Patino's acts are within the statutory definition of sexual assault. (Docket Entry No. 28, Ex. 1, ¶¶ 2.01–2.04). The plaintiffs do not allege that the Archdiocese Defendants engaged in such conduct. If applying Section 16.0045 requires that the Archdiocese Defendants can be held vicariously liable for Patino's conduct, plaintiffs' argument fails. As stated in the previous section, the plaintiffs are unable to impute Patino's intentional conduct to the Archdiocese Defendants to trigger vicarious liability.

Plaintiffs alternatively argue that they can take advantage of the five-year statute of limitations even if Patino's conduct cannot be imputed to the Archdiocese Defendants because Section 16.0045(a) is not limited to claims against an alleged perpetrator. No Texas court has examined whether Section 16.0045(a) applies to all claims in a sexual assault suit, including claims against individuals who did not themselves commit the assault, based on theories such as vicarious liability or negligence. This court must make an *Erie* guess as to how a Texas court would decide this issue. *See Assoc. Inter. Ins. Co. v. Blythe*, 286 F.3d 780, 783 (5th Cir. 2002) ("When making an *Erie*-guess in the absence of explicit guidance from the state courts, [this court] must attempt to predict state law, not to create or modify it.") (citation omitted); *see also U.S. Fleet Srvs., Inc. v. City of Fort Worth, Tex.*, 141 F. Supp.

11

2d 631, 639 (N.D. Tex. 2001) ("Unlike the Fifth Circuit—which can certify a question of state law to the Texas Supreme Court . . . the certification option is not available to a U.S. District Court.") (citing TEX. CONST. art. 5, § 3-c) (additional citations omitted).

The Archdiocese Defendants contend that the Texas statute increases the limitations period for sexual-abuse victims to file civil suits against their abusers, but not to file such suits against third parties alleged to be vicariously liable or to have negligently or recklessly allowed the abuse to occur or continue.  The Archdiocese Defendants cite a Colorado case analyzing a similar statute.  In *Sandoval v. Archdiocese of Denver*, 8 P.3d 598 (Colo. Ct. App. 2000), the court held that a Colorado statute expanding the statute of limitations for sexual-assault claims to six years applied only to civil damages suits against the alleged assailants and did not extend to claims against third-parties.  *Id.* at 602.  The court emphasized the fact that the Colorado statute incorporated the criminal-law provisions for sexual assault and "links the type of claims to which it applies to offenses listed in the criminal code."  *See id.* at 601.  The Colorado statute also included a provision stating, "Nothing in this section shall be construed to extend the statutory period with respect to vicarious liability."  COLO. R. STAT. § 13-80-103.7 (1999).

The Texas limitations statute for suits arising out of sexual assaults, like the Colorado statute, incorporates the Texas Penal Code provisions defining sexual assault.  Unlike the Colorado statute, however, the Texas statute does not include a provision excluding vicarious claims against nonperpetrators.  The majority of courts addressing statutes like Section 16.0045(a), which lack the specific language on vicarious liability that the Colorado statute

12

included, have applied the extended limitations period to all claims arising from sexual assault, including claims against nonperpetrator defendants.  These opinions note that the statutes are not limited to a single type of defendant—alleged perpetrators—but instead refer broadly to causes of action stemming from sexual abuse.  These opinions note that the tolling provisions are intended to extend the time for sexual-abuse victims to seek civil damages awards for their injuries, regardless of the legal theory they assert.  As long as the victim's injuries are related to the type of sexual abuse the statutes cover, the courts apply the limitations or tolling provisions even as to claims against nonperpetrators.  A survey of such opinions follows.

In *Nutt v. Norwich Roman Catholic Diocese*, 921 F. Supp. 66 (D. Conn. 1995), the court agreed that the Connecticut statute, which read, in pertinent part, that "no action to recover damages for personal injury to a minor, including emotional distress, caused by sexual abuse, sexual exploitation, or sexual assault may be brought by such person later than seventeen years from the date such person attains the age of majority," CONN. GEN. STAT. § 52-577, did not "limit[ ] its application to actions against the actual perpetrators of the abuse." *Nutt*, 921 F. Supp. at 72; *accord Almonte v. N.Y. Med. Coll.*, 851 F. Supp. 34, 37 (D. Conn. 1994).

In *Werre v. David*, 913 P.2d 625 (Mont. 1996), the Supreme Court of Montana similarly interpreted that state's tolling statute, which begins by stating, "An action based on intentional conduct brought by a person for recovery of damages for injury suffered as a result of childhood abuse . . ." MONT. CODE ANN. § 27-2-216(a)(b).  Relying on the plain

13

meaning of the term "based on" and the legislature's use of the term in other statutes, the court held that the statutory tolling provision was "plain, unambiguous, direct and certain and that it is not limited to intentional tort actions against perpetrators of childhood sexual abuse." *Werre*, 913 P.2d at 632.

The Supreme Court of Vermont similarly concluded that the Vermont legislature did not intend to limit the use of its tolling provision to claims against perpetrators of child sexual abuse. The Vermont statute reads:

> (a) A civil action brought by any person for recovery of damages for injury suffered as a result of childhood sexual abuse shall be commenced within six years of the act alleged to have caused the injury or condition, or six years of the time the victim discovered that the injury or condition was caused by that act, whichever period expires later. The victim need not establish which act in a series of continuing sexual abuse or exploitation incidents caused the injury.
>
> ****
>
> (c) As used in this section, "childhood sexual abuse" means any act committed by the defendant against a complainant who was less than 18 years of age at the time of the act and which act would have constituted a violation of a statute prohibiting lewd and lascivious conduct, lewd or lascivious conduct with a child, sexual assault or aggravated sexual assault in effect at the time the act was committed.

Vt. Stat. Ann. tit. 12, § 522(a), (c). In construing the statute, the court held that it found "nothing in the statutory language suggesting that the Legislature intended to exclude nonperpetrators from the reach of the statute." *Sabia v. Patterson*, 669 A.2d 1187, 1198 (Vt. 1995). Unlike the Colorado court, which found the inclusion of criminal definitions of

sexual abuse key to its decision that the civil statute applied only to actions against perpetrators, the Vermont court held that "[u]se of the word 'act' in different contexts in different sentences of the statute does not compel the conclusion that the 'act' complained of must always be the 'act' of sexual abuse itself." *Id.*

Courts interpreting other state-law limitations statutes that similarly borrow penal-law definitions hold that such "borrowing" does not in and of itself limit the statutes to claims against the alleged perpetrators. *See Delonga v. Diocese of Sioux Falls*, 329 F. Supp. 2d 1092, 1103 (D.S.D. 2004) (interpreting a statute that explicitly used criminal-law definition of childhood sexual abuse in accordance with the majority rule, noting that "[t]he focus of the statute at hand, as gleaned from its language, is on actions flowing from a particular type of harm, not on the nature of the party or parties causing the harm"); *Hobert v. Covenant Children's Home*, 723 N.E.2d 384, 387 (Ill. App. 2000) (same); *C.J.C. v. Corp. of the Catholic Biship of Yakima*, 985 P.2d 262, 268 (Wash. 1999) (same); *Phinney v. Morgan*, 654 N.E.2d 77, 80 (Mass. Ct. App. 1995) (same).

Most of the courts interpreting similar statutory provisions analyze the legislative history. Courts endorsing the majority view consistently find a legislative intent to increase the availability of recovery for sex-abuse victims. In these cases, courts often note a legislative endorsement of the social-science view that victims may repress memories of the abuse or deny that they were abused as a way to cope and regularly require years to appreciate the fact and extent of what occurred. *See, e.g., C.J.C.*, 985 P.2d at 269 ("The Legislature adopted 'findings and intent,' which make clear that its primary concern was to

provide a broad avenue of redress for victims of childhood sexual abuse who too often were left without a remedy under previous statutes of limitation.").

Some courts in states with similar statutes have adopted the Colorado court's reasoning. *See Kelly v. Marcantonio*, 678 A.2d 873, 877 (R.I. 1996) (construing R.I. GEN. LAWS § 9-1-51 to apply only to claims against the perpetrator of a sexual assault); *Roman Catholic Bishop of Louisville v. Burden*, 168 S.W.3d 414, 418 (Ky. Ct. App. 2004) (noting in *dicta* that it agrees with the Rhode Island interpretation of its tolling provision, KEN. REV. STAT. § 413.249); *Debbie Reynolds Prof'l Studios v. Superior Court*, 30 Cal. Rptr. 2d 514, 519 (Cal. Ct. App. 1994) (construing CAL. CODE OF CIV. P. § 340.1, which tolls the statute of limitations for cases seeking redress for "any act committed by a defendant against a plaintiff . . . and which act would have been proscribed" under the California Penal Code as child sexual assault, to apply only to claims against perpetrators).  The courts narrowly construing these statutes generally discern a legislative focus on punishing the perpetrators of child sex abuse, not on compensating the victims.  *See, e.g.*, *Sandoval*, 8 P.3d at 603 ("The sponsor concluded that the statute would 'send a message to the perpetrators' that they will 'not easily be let off the hook.' . . . every reference to 'the defendant' identified that individual as the perpetrator of the sexual assault") (quoting legislative history); *Debbie Reynolds Prof'l Rehearsal Studios*, 30 Cal. Rptr. 2d at 231 (discussing legislative history and holding that the legislature focused on punishing the perpetrators of child sex abuse, not making the victims whole).

An *Erie* guess as to what the Texas Supreme Court would make of such precedents does not have an obvious answer.  As noted, the Texas statute has some, but not all, of the language courts rely on to apply similar statutes against nonperpetrators like the Archdiocese Defendants.  The starting point is the words of the statute itself.  "[I]t is cardinal law in Texas that a court construes a statute, 'first, by looking to the plain and common meaning of the statute's words.' "  *Fitzgerald v. Advanced Spine Fixation Sys, Inc.*, 996 S.W.2d 864, 865 (Tex. 1999) (quoting *Liberty Mut. Ins. Co. v. Garrison Contractors*, 966 S.W.2d 482, 484 (Tex. 1998)).  "If the meaning of the statutory language is unambiguous, [Texas courts] adopt, with few exceptions, the interpretation supported by the plain meaning of the provision's words and terms."  *Id.* (citations omitted).  "[I]f a statute is unambiguous, rules of construction or other extrinsic aids cannot be used to create ambiguity."  *Id.* at 865–66.  The Texas legislature provides further direction: "In construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider among other matters the: (1) object sought to be attained; (2) circumstances under which the statute was enacted; (3) legislative history; (4) common law or former statutory provisions, including laws on the same or similar subjects; (5) consequences of a particular construction; (6) administrative construction of the statute; and (7) title (caption), preamble, and emergency provision."  TEXAS GOV. CODE ANN. § 311.023.  Seemingly inconsistent statutory provisions should be reconciled to the extent possible.  *Id.* at § 311.025.  If reconciliation is not possible, the later-passed statute or amendment controls.  *Id.*

Section 16.0045 reads, in full:

> (a)  A person must bring suit for personal injury not later than five years after the day the cause of action accrues if the injury arises as a result of conduct that violates:
>
> > (1)  Section 22.011, Penal Code (sexual assault); or
> >
> > (2)  Section 22.021, Penal Code (aggravated sexual assault).
>
> (b)  In an action for injury resulting in death arising as a result of conduct described by Subsection (a), the cause of action accrues on the death of the injured person.
>
> (c)  The limitations period under this section is tolled for a suit on the filing of a petition by any person in an appropriate court alleging that the identity of the defendant in the suit is unknown and designating the unknown defendant as "John or Jane Doe." The person filing the petition shall proceed with due diligence to discover the identity of the defendant and amend the petition by substituting the real name of the defendant for "John or Jane Doe" not later than the 30th day after the date that the defendant is identified to the plaintiff. The limitations period begins running again on the date that the petition is amended.

TEX. CIV. PRAC. & REM. CODE § 16.0045.

The Texas statute generically refers to a "suit." Like statutes in other jurisdictions that are interpreted broadly as applying both to alleged assailants and to nonperpetrators, the Texas language requires a nexus with criminal sexually-assaultive acts. Unlike some statutes that are interpreted narrowly as applying only to alleged assailants, the Texas provision is not limited to suits against the individual who would be the defendant in a criminal prosecution. *Cf.* R.I. GEN. LAWS § 9-1-51(e) (defining "childhood sex abuse" as "any act committed by *the defendant* against a complainant who was less than eighteen (18) years of age at the time

18

of the act and which act would have been a criminal violation of chapter 37 title 11")
(emphasis added); *Sandoval*, 8 P.3d at 601–03 (interpreting the statute narrowly based on the
use of criminal statutory definitions and the explicit exclusion of vicarious liability theories
from the tolling statute).

The introductory phrase in the Texas statute, "A person must bring suit," is used
throughout Chapter 16 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC.
& REM. CODE §§ 16.004, 16.007, 16.008, 16.010, 16.024, 16.025, 16.026, 16.027, 16.035.
It is not given a different meaning in Section 16.0045.  In different parts of the Texas Civil
Practice and Remedies Code, the limitations periods are set for specific causes of action.  For
example, Section 16.004 provides:  "A person must bring suit on the following actions not
later than four years after the day the cause of action accrues:  (1) specific performance of
a contract for the conveyance of real property; (2) penalty or damages on the penal clause of
a bond to convey real property; (3) debt; (4) fraud; or (5) breach of fiduciary duty."  TEX.
CIV. PRAC. & REM. CODE § 16.004(a).  Section 16.0045 states that it applies to a "suit for
personal injury," which can include negligence claims.  No language restricts this limitations
statute to certain types of personal-injury claims, so as to exclude claims based on vicarious
liability or claims that a nonperpetrator is directly liable for allowing the allegedly tortious
conduct to occur or continue.  There is no language similar to that used in the Colorado
statute making clear the legislature's intent to limit the provision to causes of action against
the perpetrators of child sexual assault.  Part (c) of Section 16.0045 permits a plaintiff to
designate unknown persons as defendants in a civil suit based on childhood sexual abuse.

Part (a) amends the default limitations provision, Section 16.003, to extend the limitations period from two to five years. Taken together, the provisions of Section 16.0045 unambiguously show an intent to provide victims of sexual assault and aggravated sexual assault more time to seek damages for their injuries.

The Texas statute is more similar to statutes that courts have applied broadly than to statutes that courts have limited to claims against perpetrators. For example, California's narrowly-applied statute is specifically limited to claims against perpetrators; the statute creates a special tolling provision for claims against perpetrators of child sex abuse for the purpose of increasing the likelihood that they are punished. *See Debbie Reynolds Prof'l Rehearsal Studios*, 30 Cal. Rptr. 2d at 519. By contrast, the Texas statute specifically extends the statute of limitations for sexual-assault victims to increase their opportunity to seek civil recoveries for the abuse. In this respect, Section 16.0045 is more similar to the Connecticut, Illinois, Iowa, Massachusetts, Montana, South Dakota, Washington, and Vermont statutes, all of which have been broadly interpreted to extend to all civil damages claims arising from sexual abuse, including claims against nonperpetrators.

Finally, the Texas statute's legislative history is similar to that cited by courts broadly applying other states' statutes to claims against nonperpetrators as well as against the perpetrators themselves. A legislative report generated during the drafting of the Texas statute states:

> . . . In many cases the victim of rape or sexual assault requires more than two years to fully resolve the emotional conflicts involved with such acts of violence.  Extending the statute of limitations by three years would provide victims with a better opportunity to muster the necessary emotional strength to face their accused.
>
> Often victims of rape or sexual assault suppress the incidents until they get professional help and/or regain their emotional health.  Extending the statute of limitations in these instances would allow victims more time to recall fully the acts of violence that occurred.

House Research Organization Bill Analysis, 74th Legislature, Number 72, HB 2330, May 11, 1995 (submitted as Docket Entry No. 34, Ex. 11) at 45.

This court concludes that if presented with the question, the Texas Supreme Court would join the majority of state courts considering similar statutes and hold that the limitations period of Section 16.0045 applies to claims against nonperpetrators of sexual abuse as well as to claims against alleged perpetrators.  The plaintiffs claim that the Archdiocese Defendants negligently allowed Patino to commit the alleged abuse to occur and to continue, even though they knew, or should have known, of his proclivities.  Because the plaintiffs can take advantage of Section 16.0045, the Archdiocese Defendants' motion to dismiss these claims on the basis of statute of limitations is denied.

> 2.    *Failure to State a Claim: Negligence* Per Se *and Gross Negligence*

The Archdiocese Defendants alternatively argue that the plaintiffs' negligence *per se* and gross negligence claims fail as a matter of law.  (Docket Entry No. 6 at 21).  The

21

plaintiffs' negligence *per se*[2] and gross negligence claims are based in part on the Archdiocese Defendants' failure to report the information about Patino's alleged sexual abuse to the authorities.  (*See* Docket Entry No. 31, ¶ 13.01 ("Defendants acted maliciously in that, either by act or omission, they exposed Plaintiffs to an extreme degree of risk of physical harm considering the probability and magnitude of the potential harm to them.")). The Texas Supreme Court has addressed the legal basis for this contention.  In *Perry v. S.N.*, 973 S.W.2d 301 (Tex. 1998), the Supreme Court of Texas specifically rejected negligence *per se* and gross negligence claims under the State's child abuse reporting statutes.  The court explicitly stated that its holding applied to all negligence *per se* claims predicated on conduct that allegedly breaches the Texas Family Code requirement that individuals who witness child abuse must report it.  *Id.* at 308–09.  To the extent that the plaintiffs' gross negligence claims are based on the Archdiocese Defendants' alleged failure to report child sexual abuse, the motion to dismiss these claims is granted.  To the extent that the plaintiffs' claims do not rely on the Texas child abuse reporting statute, the plaintiffs have stated a gross negligence claim for which relief may be granted and the motion to dismiss is denied.  Plaintiffs' motion for leave to amend their complaint to include the gross negligence claim is granted in part and denied as futile in part.

---

[2]  The plaintiffs did not include the previously alleged negligence *per se* claim in the supplemental pleading, (Docket Entry No. 31).  The Archdiocese Defendants' motion to dismiss this claim is granted for this independent reason.

### 3.    *The First Amendment as a Bar to the Negligence Claims*

The Archdiocese Defendants alternatively argue that the plaintiffs' negligence claims should be dismissed as a matter of law because they are nonjusticiable under the First Amendment.  (Docket Entry No. 10 at 17–18).  The plaintiffs' proposed Second Amended Complaint alleges thirteen negligence claims.   Specifically, plaintiffs allege that the Archdiocese Defendants negligently: (1) investigated, hired, supervised, reassigned, and retained clerics known to have abused minors; (2) failed to warn parishioners that a cleric assigned to their parishes could be a threat to their children; (3) ignored warnings from medical professionals retained by various Church officials and organizations, directly or indirectly, that certain clerics posed a danger to children; (4) lied to victims who asked for information about abusers; (5) failed to provide medical professionals evaluating abusers who were clerics with the necessary facts and, in some cases, lying to the medical professionals about the clerics' background or concealing material facts; (6) ignored warnings from others within the church and bishop's conference who warned that certain clerics posed a threat to children; (7) failed to report the crimes committed by certain clerics to law enforcement and obstructed or interfering with law enforcement investigations concerning abusive clerics; (8) failed to alert members of parishes where abusive clerics had previously served that their children were exposed to known or suspected child molesters; (9) made decisions that valued the interests of abusive clerics and the Church's desire to avoid scandal over the interests of children who had been abused by clerics; (10) used Church influence to alter the outcome of the criminal legal process relating to clerics who

engaged in illegal sexual acts; (11) fostered an environment and culture that allowed child abuse to flourish and made it clear that there was no accountability for criminal sexual acts against children; (12) negligently destroyed documents about clerics' child sexual abuse or illegally withheld them from authorities, victims' families, and the public; and (13) failed to warn Church members about facts such as the "Beal deposition," "i.e., that priests have been 'hitting' on penitents, including children, since the inception of the private confession-box in the sixteenth century." (Docket Entry No. 28, Ex. 1, ¶¶ 9.02(a)–(m)). The Archdiocese Defendants contend that deciding these claims will require impermissible judicial interpretation of Church doctrine.

Churches maintain the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952). Religious questions about beliefs and doctrines are not appropriate for secular judicial resolution. *United States v. Ballard*, 322 U.S. 78, 86 (1944). The Fifth Circuit has recognized that a court should not "identify and apply the teachings of a particular faith, thereby making the judiciary responsible for determining what conduct and beliefs are part of a particular religion." *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 337 (5th Cir. 1998). The First Amendment does not, however, "categorically insulate religious relationships from judicial scrutiny, for to do so would necessarily extend constitutional protection to the secular component of those relationships." *Hawkins v. Trinity Baptist Church*, 30 S.W.3d 446, 452 (Tex. App. – Tyler, no writ. 2000) (citing *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 335–36 (5th Cir. 1998)).

24

In *Nutt v. Norwich Roman Catholic Diocese*, which included negligence allegations similar to those asserted against the Archdiocese Defendants in the present case, the court rejected a First Amendment challenge to the plaintiff's negligence claims, stating as follows:

> The court's determination of an action against the defendants based upon their alleged negligent supervision of [the priest] would not prejudice or impose upon any of the religious tenets or practices of Catholicism. Rather, such a determination would involve an examination of the defendants' possible role in allowing one of its employees to engage in conduct which they, as employers, as well as society in general expressly prohibit. Since the Supreme Court has consistently failed to allow the Free Exercise Clause to "relieve [an] individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs," the defendants can not appropriately implicate the First Amendment as a defense to their alleged negligent conduct. *Minersville Sch. Dist. Bd. of Ed. v. Gobitis*, 310 U.S. 586, 594–95 (1940).

*Nutt*, 921 F. Supp. at 74.  The same logic applies here.  Deciding the plaintiffs' negligence claims will not require examination or interpretation of Catholic doctrine, practice, or religious tenets.  Instead, deciding the negligence claims will require applying general common-law negligence standards, which are not directed to the "promotion or restriction" of religious belief, to the evidence about the Archdiocese Defendants' acts and omissions.

The Archdiocese Defendants also assert that the negligence claims do not relate to Patino's involvement with the plaintiffs, but instead "are general claims of malfeasance with no factual or causal connection to this case."  (Docket Entry No. 10 at 17).  A review of the proposed Second Amended Complaint reveals some negligence allegations that are so general as to be unrelated to the facts of this case.  (Docket Entry No. 28, ¶¶ 9.02(a), (b), (d),

(e), (g), (i), (j), (k), (l), (m)).  These allegations cannot, in themselves, serve as a basis on which relief can be granted.  The plaintiffs are not, however, precluded from alleging facts that, if proven, could support their claims by showing that the Archdiocese Defendants' actions or omissions with respect to Patino followed a general policy or practice relating to supervision, hiring, and retention of sexually-abusive clerics or to providing information about them.  By way of example, the plaintiffs are not precluded from alleging facts that, if proven, demonstrate that the Archdiocese Defendants knew of Patino's dangerous propensities, but nevertheless placed him in a position that allowed him unsupervised and easy access to child victims.  The plaintiffs cannot, however, use this case as a forum for putting the Catholic Church or its religious doctrines "on trial."

The motion to dismiss the negligence claims is granted in part and denied in part; the motion to dismiss the defective premises claim is denied.[3]

## C.     The Mental Health Services Provider Claim

The Archdiocese Defendants argue that the plaintiffs have failed to state an actionable mental health services provider claim under the Texas Civil Practice and Remedies Code. (Docket Entry No. 6 at 15).  The Archdiocese Defendants argue that Patino was not a "mental health services provider" under TEX. CIV. PRAC. & REM. CODE § 81.001, that Patino did not provide "counseling" as defined by that statute, that the plaintiffs were not Patino's "patients" as defined by that statute, and that the Archdiocese Defendants were not Patino's

---

[3] The Archdiocese Defendants did not raise any challenge to the defective premises claim other than the statute of limitations argument.

"employer" for the purposes of that statute.  The plaintiffs contest each of these arguments and point to allegations in the complaint to support their arguments.

The Texas statute at issue prohibits sexual exploitation of a patient by a mental health services provider.  The statute reads:

> A mental health services provider is liable to a patient or former patient of the mental health services provider for damages for sexual exploitation if the patient or former patient suffers, directly or indirectly, a physical, mental, or emotional injury caused by, resulting from, or arising out of:
>
> > (1) sexual contact between the patient or former patient and the mental health services provider;
> >
> > (2) sexual exploitation of the patient or former patient by the mental health services provider; or
> >
> > (3) therapeutic deception of the patient or former patient by the mental health services provider.

TEX. CIV. PRAC. & REM. CODE § 81.002.  Section 81.003 makes the mental health services provider's employer liable if: the employee violates section 81.002; the violation causes injury; and the employer fails to inquire within five years after the sexual exploitation is disclosed or the employer knows or has reason to know that the employee was engaged in sexual exploitation and failed to stop or report it.  TEX. CIV. PRAC. & REM. CODE § 81.003(a), (c)–(e).

Section 81.001 defines the relevant terms.  "Mental health services" means "assessment, diagnosis, treatment, or counseling in a professional relationship to assist an individual or group in:  (A) alleviating mental or emotional illness, symptoms, conditions,

or disorders, including alcohol or drug addiction; (B) understanding conscious or subconscious motivations; (C) resolving emotional, attitudinal, or relationship conflicts; or (D) modifying feelings, attitudes, or behaviors that interfere with effective emotional, social, or intellectual functioning."  TEX. CIV. PRAC. & REM. CODE § 81.001(1).  A "mental health services provider" is defined as "an individual, licensed or unlicensed, who performs or purports to perform mental health services, including a . . . member of the clergy" or a "psychologist offering psychological services as defined by Section 501.003, Occupations Code."  *Id.* at § 81.001(2)(E), (G).  "Mental health services" provided by a member of the clergy do not include "religious, moral, and spiritual counseling, teaching, and instruction." *Id.* at § 81.001(7).  Under the statute, a "patient" is any "individual who seeks or obtains mental health services. . . ."  *Id.* at § 81.001(3).

The plaintiffs allege that Patino held himself out to them and to their parents as a "counselor" for young boys.  (Docket Entry No. 28, Ex. 1, ¶ 2.03).  Patino allegedly told Doe II and Doe III's mother that he had a degree in counseling and showed Doe III a document that he described as a professional certificate.  (*Id.* at ¶¶ 2.03–2.04).  Sections 81.001(2)(E) and 81.001(7) specifically include unlicensed mental health services providers and clergy members who provide "mental health services" other than religious, moral, and spiritual counseling, teaching, and instruction.  The plaintiffs' proposed Second Amended Complaint also includes allegations that Patino told the boys' mothers that he would provide "counseling" to the children, in order to obtain unsupervised and private access to them.  (*Id.* at ¶¶ 2.03–2.04).  The allegations do not specify whether Patino offered religious, moral, or

28

spiritual counseling, teaching, or instruction, which is outside the scope of Section 81.001(7), or whether he offered the type of counseling that is within the statute's coverage. Because deciding a motion to dismiss requires this court to take the allegations in the light most favorable to the plaintiffs, the allegations that Patino's conduct fell within the scope of Section 81.001(7) are sufficient to withstand dismissal.

The plaintiffs' allegations as to the liability of a mental health service provider's employer are also sufficient to avoid dismissal. The proposed Second Amended Complaint alleges that the Archdiocese Defendants employed Patino, knew or should have known of the risk that he posed to the plaintiffs, and failed to act to stop it. (Docket Entry No. 28, Ex. 1, ¶¶ 2.05–2.11, 2.14–2.16, 7.03–7.05, 7.11–7.13).

The Archdiocese Defendants' motion to dismiss the mental health services claims and the concomitant conspiracy to violate the mental health services statute claim is denied. Plaintiffs' motion for leave to amend and supplement as to these claims is granted.

### D.    The Fraud, Fraudulent Misrepresentation, Negligent Misrepresentation, and Conspiracy to Commit Fraud and Fraudulent Misrepresentation Claims

The Archdiocese Defendants claim that the plaintiffs have recast their personal-injury claims as fraud claims that cannot proceed. The Archdiocese Defendants argue that the plaintiffs have not alleged any actionable misrepresentation and, alternatively, that any reliance by the plaintiffs would be unreasonable as a matter of law. (Docket Entry No. 6 at 12–15). The plaintiffs respond that they have pleaded facts to support their misrepresentation claims. (Docket Entry No. 34 at 39).

Under Texas law, fraud requires proof of "a material representation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998). To state a claim for fraudulent misrepresentation, a plaintiff must allege that the defendant made a statement, which was false, with knowledge of its falsity or reckless disregard for its truth, with the intent that the listener rely on the statement, and that the listener reasonably did so. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992). To state a claim for negligent misrepresentation, a plaintiff must allege that the defendant made a statement, which was false, without exercising reasonable care or competence in obtaining or communicating the information, on which the plaintiff reasonably relied and suffered injury. *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).

The plaintiffs' Proposed Second Complaint generally alleges that the Archdiocese Defendants "fraudulently misrepresented material facts" and provided "partial disclosures that created a false impression" that Patino "was a celibate, sexually safe, moral cleric who would not be sexually dangerous to minors." (Docket Entry No. 28, Ex. 1, ¶¶ 6.02, 6.04, 6.03). The plaintiffs's proposed Second Amended Complaint fails to plead any specific misrepresentation on which they relied. The Fifth Circuit, interpreting Texas law, has specifically rejected the "implied" misrepresentation theory such as the plaintiffs allege. *See Crenshaw v. Gen. Dynamics Corp.*, 940 F.2d 125, 127 (5th Cir. 1991). Texas state courts

30

have endorsed this view, noting that "a plaintiff's statement of what he thought was implied by defendant's representation is not sufficient to support an actionable misrepresentation." *Bevan v. Gen. Elec. Credit Equities*, No. 14-98-00233-CV, 1999 WL 1041185, *2 (Tex. App. – Houston [14th Dist.] 1999, pet. denied) (citing and discussing *Crenshaw*).

Because the plaintiffs have failed to plead any specific misrepresentation by the Archdiocese Defendants about Patino, the intentional and negligent misrepresentation claims and the related conspiracy claims are dismissed. Plaintiffs' motion for leave to amend or supplement as to these claims is denied as futile.

**V.     Conclusion**

The Archdiocese Defendants' motions to dismiss the intentional tort claims (assault by offensive physical contact, intentional infliction of emotional distress, and related conspiracy claims), and the negligence *per se* claims are granted; the motion to dismiss the gross negligence claims is granted in part; the plaintiffs' motions for leave to amend and supplement as to these claims are denied. The Archdiocese Defendants' motions to dismiss the negligence, gross negligence, and mental health services provider claims are denied; the plaintiffs' motions for leave to amend and supplement as to these claims is granted. This court will hold a status conference on **April 5, 2006 at 10:00 a.m**, in courtroom 11-B. The parties should be prepared to discuss the scope of discovery.

The Archdiocese Defendants should also be prepared to discuss their argument that Patino's mental health records, which were allegedly disclosed by Patino to the Archdiocese Defendants, are privileged.

SIGNED on March 27, 2006, at Houston, Texas.

Lee H. Rosenthal
United States District Judge