**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JOHN DOE I,  JOHN DOE II, and | § | |
| JOHN DOE III, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-05-1047 |
| | § | |
| ROMAN CATHOLIC DIOCESE OF | § | |
| GALVESTON-HOUSTON, *et al.,* | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

Plaintiffs John Doe I, John Doe II, John Doe III, and John Doe IV sued the

Archdiocese of Galveston-Houston; Joseph Fiorenza, then Bishop of the Diocese; and

William Pickard, then Monsignor of the parish.  The plaintiffs allege that in 1996, when they

were children whose parents were members of the St. Francis de Sales Parish Church, Juan

Carlos Patino-Arango ("Patino"), a seminarian in a pastoral internship at St. Francis training

to become a deacon, sexually assaulted them.  The plaintiffs assert state-law claims for

negligence in hiring and supervising Patino.  The plaintiffs also allege that the defendants

violated the Texas Sexual Exploitation by a Mental Health Services Provider Act, TEX. CIV.

PRACTICES & REMEDIES CODE § 81.001 *et seq.*, by failing to report the abuse.  They also

allege that the defendants breached a common-law duty to report the abuse.  Finally, they

assert a cause of action for premises liability based on the defendants' failure to warn the plaintiffs of Patino's propensity to abuse children.[1]

The defendants have moved for summary judgment. As to the negligent hiring, assignment, and supervision claims and the premises liability claim, the defendants argue that as a matter of law, the risk that Patino would sexually abuse young boys was not reasonably foreseeable. The defendants also argue that their own acts or omissions did not proximately cause the plaintiffs' injuries. (Docket Entry No. 98 at 3–9). As to the statutory failure-to-report claim, the defendants argue that this case does not fall under the Texas Sexual Exploitation by a Mental Health Services Provider Act and that they did not violate the Act. (*Id*. at 12–22). As to the common-law failure-to-report claim, the defendants argue that Texas law does not recognize such a duty or, alternatively, that they did not know and could not reasonably have known that Patino would abuse children. (*Id*. at 20, 23). The plaintiffs have responded, asserting that there are disputed fact questions as to these issues. (Docket Entry No. 102). The defendants have replied, (Docket Entry No. 109), and the plaintiffs have surreplied, (Docket Entry No. 115).

---

[1] The plaintiffs also named Patino as a defendant but have been unable to locate him to serve him with process.

This court previously dismissed claims against Pope Benedict XVI based on head-of-state immunity. (Docket Entry No. 62). As to the remaining defendants, this court previously dismissed the plaintiffs' claims of vicarious liability for Patino's intentional torts; breach of confidential or fiduciary relationships; gross negligence or negligence *per se* based on failure to report child sexual abuse; and for intentional misrepresentation. (Docket Entry No. 63). This court denied the plaintiffs' motion to amend and supplement with respect to these claims. (*Id*.). Though the plaintiffs allege intentional misrepresentation in the third amended complaint, (Docket Entry No. 95), that cause of action was previously dismissed. (Docket Entry No. 63).

Based on a careful review of the motion, response, reply, surreply, and objections; the record; and the applicable law, this court denies the defendants' motion for summary judgment as to the negligent assignment and supervision claims and the premises liability claim.  This court grants summary judgment as to the common-law failure-to-report claim and the claim under the Texas Sexual Exploitation by a Mental Health Services Provider Act. The plaintiffs' motion to compel additional answers to certified questions is granted in part and denied in part.  (Docket Entry No. 101).  Finally, the plaintiffs' motion for a pretrial scheduling conference is granted.  (Docket Entry No. 110).  A pretrial scheduling and status conference is set for **October 10, 2007, at 1:30 p.m.**  This memorandum and order outlines issues to be addressed at that conference.

The reasons for these rulings are explained below.

## I.      Background

### A.      The Summary Judgment Evidence

The record includes the depositions of Doe I and his mother and father, as well as Doe I's affidavit;[2] the depositions of Does II and III, who are half-brothers, and of their mother and stepfather;[3] and the depositions of Doe IV and his mother.[4]  The record also includes depositions from Church officials who were involved in deciding to select Patino for the internship, in supervising him in that position, and in investigating after one of the children

---

[2]Docket Entry No. 98, Exs. 11–13; Docket Entry No. 102, Ex. 24.

[3]Docket Entry No. 98, Exs. 14–17.

[4]Docket Entry No. 98, Exs. 18, 19.

3

accused Patino of abuse.  Those deposed include Father Stephen Tiemann, director of vocations for the Diocese; Monsignor Frank Rossi, chancellor and moderator of the curia and a vicar general for the Diocese; and Bishop Fiorenza.[5]

The record includes the application materials the Diocese officials examined when the decision was made to admit Patino as a seminarian in the pastoral internship at St. Francis de Sales.  The materials include a letter from Patino and an autobiographical statement;[6] Patino's educational records;[7] a letter from the seminary in Colombia that Patino had briefly attended eight years earlier and from which he had been expelled;[8] a letter from Monsignor Pickard about Patino;[9] and Father Tiemann's records about hiring Patino.[10] The record also contains a written deposition by Dr. Gregory Lester, a psychiatrist who evaluated Patino as part of the screening process leading to his placement in the internship program at St. Francis de Sales,[11] and Dr. Lester's report to the Diocese on Patino.[12] The defendants have submitted Monsignor Rossi's records about the investigation after the child reported Patino's abuse.[13]

---

[5]Docket Entry No. 98, Exs. 20–22.

[6]Docket Entry No. 98, Exs. 1, 3.

[7]Docket Entry No. 98, Ex. 7.

[8]Docket Entry No. 98, Ex. 5.

[9]Docket Entry No. 98, Ex. 8.

[10]Docket Entry No. 102, Exs. 6–8, Docket Entry No. 102, Ex. 23.

[11]Docket Entry No. 102, Ex. 13.

[12]Docket Entry No. 98, Exs. 2, 4.

[13]Docket Entry No. 98, Exs. 9–10.

The plaintiffs also provided evidence as to the events after one of the boys reported Patino's abuse, including affidavits from custodians of record for the Texas Department of Family and Protective Services and the Houston Police Department.[14]

The plaintiffs have also submitted two expert reports.  One is by Thomas Patrick Doyle, a Catholic priest,[15] and one is by Aquinas Walter Richard Sipe, a former Catholic priest.[16]  The plaintiffs have also submitted an affidavit and supporting documents by David Holley, a former Catholic priest.[17]  The plaintiffs have also submitted various documents from the Catholic Church, including excerpts of Canon law reprinted in a commentary,[18] the 1992 Program of Priestly Formation,[19] a 1961 Vatican directive to religious orders,[20] and an excerpt from the *Dictionary of Moral Theology*.[21]

The plaintiffs have objected to some of the evidence presented by the defendants in their motion for summary judgment, (Docket Entry No. 103), the defendants have responded, (Docket Entry No. 107), and the plaintiffs have replied, (Docket Entry No. 111).  The plaintiffs have also objected to some of the evidence presented by the defendants in their

---

[14]Docket Entry No. 102, Exs. 15–16.

[15]Docket Entry No. 102, Ex. 14.

[16]Docket Entry No. 102, Ex. 11.

[17]Docket Entry No. 102, Ex. 19.

[18]Docket Entry No. 102, Ex. 2.

[19]Docket Entry No. 102, Ex. 3.

[20]Docket Entry No. 102, Ex. 4.

[21]Docket Entry No. 102, Ex. 22.

reply brief, (Docket Entry No. 112), and the defendants have responded, (Docket Entry No. 116).  The defendants have objected to some of the evidence produced by the plaintiffs in their response to the motion for summary judgment, (Docket Entry No. 108), the plaintiffs have responded, (Docket Entry No. 114), and the defendants have replied, (Docket Entry No. 117).  The objections are addressed in the analysis of the defendants' summary judgment motion.

### III.    Factual Background

In 1994, Patino, a Colombian citizen, was selected for a pastoral internship in the Archdiocese of Galveston-Houston.  Patino had completed the academic portion of his seminary training, but he needed "pastoral formation" training before he could become a deacon, the next step toward the priesthood.  As a seminarian in a pastoral internship, Patino worked at the St. Francis de Sales Parish Church and lived at the rectory.

In 1996, after Patino had been at the church for approximately two years, a child whose family belonged to St. Francis told his parents that Patino had sexually abused him. The parents promptly reported the abuse to Church officials.  Patino admitted the abuse.  The defendants dismissed Patino from St. Francis and from the internship program and placed him in a residential facility operated by a priest, where he lived for a few weeks and received counseling.  Patino left the country a few weeks later.

The other three plaintiffs did not come forward with allegations that Patino had abused them until years later.  The other plaintiffs were also sons of families who belonged to St. Francis.  The defendants do not dispute that Patino sexually abused the plaintiffs.

6

When Patino was selected for the internship and served as a seminarian at St. Francis and when the abuse was first reported, Archbishop Joseph Fiorenza was the Bishop of the Archdiocese, (Docket Entry No. 98, Ex. 22 at 7); Monsignor Frank Rossi was the chancellor of the Diocese of Galveston-Houston and moderator of the curia and served as director of the secretariat for clergy formation and chaplaincy services, (*id.*, Ex. 21 at 22–24); Monsignor Pickard was the pastor of St. Francis and Patino's direct supervisor in the internship program, (*id.*, Ex. 21 at 82); and Father Tiemann was the director of vocations for the Diocese, (*id.*, Ex. 20 at 7–8).   All these individuals except Monsignor Pickard have been deposed. Monsignor Pickard has been diagnosed with Alzheimer's and cannot be deposed or provide evidence.  (Docket Entry No. 98 at 11–12).

## A.   The Facts Relating to the Selection of Patino as a Seminarian and Pastoral Intern

In May 1996, Patino was referred to the Diocese of Galveston-Houston as part of a program to locate qualified candidates for the priesthood whose first language was Spanish. (Docket Entry No. 98, Ex. 21 at 39–43; Docket Entry No. 102  Ex. 8).  Patino submitted application materials to the Diocese.  Father Tiemann and his direct supervisor, Monsignor Rossi, were both involved in the process that led to Patino's selection; Bishop Fiorenza had little direct involvement, although he had the authority to overrule the selection.  The Diocese followed the usual process in deciding whether to accept Patino as a pastoral intern training for ordination. The selection process is designed to identify those who will qualify as priests, which includes their ability to "live the chaste, celibate lifestyle."  (Docket Entry No. 98, Ex.

21 at 27).   The process involved reviewing the candidate's application materials and contacting his references.  The candidate was interviewed by Father Tiemann and by an advisory board made up of pastors, a lay member, and the staff of the vocations office.  The process included a psychological evaluation of the candidate.

Father Tiemann testified that he reviewed Patino's application materials, including academic transcripts that showed that he had attended high school in Colombia and entered seminary but left after six months.  After leaving seminary, Patino obtained a bachelor's degree in philosophy, (Docket Entry No. 98, Ex. 7 at DIO0106), as well as the degree of theologian, (*id.*, Ex. 7 at DIO0100), both from Bolivar Pontifical University.  Patino had completed the academic requirements for a seminarian; he only lacked the pastoral formation training to proceed toward ordination.  In his autobiographical statement, Patino disclosed that he had left the seminary in Colombia because he had "adjustment problems due to certain issues with the then Father Rector."  (*Id.*, Ex. 3 at DIO0088).  In his deposition, Father Tiemann was asked, "[were there] no written policies and procedures for the diocesan office of vocations as to what is required to accept a person such as Mr. Patino to be a seminarian and then assign him to a supervised pastoral job?"  (*Id.*, Ex. 20 at 27).  Father Tiemann answered, "Basically the only preemptive one is simply . . . if you have any awareness that they—that there's some sort of evidence that they are not fit or if—certainly if they have been in any other formation program or seminary that you get some sort of response or you find out from that prior rector, if they were in a seminary program, if they

8

were expelled." (*Id.*, Ex. 20 at 27–28).[22]  Father Tiemann sent a letter to the rector of the

seminary in Colombia asking for information about Patino.  Father Tiemann sent the

response to another priest for translation from Spanish. (*Id.*, Ex. 20 at 54–55).  As translated,

the letter read as follows:

> Dear Father,
> I am pleased to address you in order to answer your request for
> information about Juan Carlos Patiño Arango.  Juan Carlos
> studied in this Seminary for only one semester in 1986.  Thus,
> I do not have much information to share with you about him.
> He left the Seminary due to certain delicate manners he had.
> Since eight years have passed, you can observe him by yourself
> now and see how he is currently behaving.  I also talked with
> some of his former mates—who are now priests—they all give
> good reports.
> Sincerely,
> Father Luis Gaviria L.
> Major Seminary
> Rector

(*Id.*, Ex. 20 at 57; *id.*, Ex. 5 at DIO0107).  Father Tiemann testified that he interpreted this

letter to mean that the rector thought Patino was "effeminate."  Father Tiemann's own

interviews with Patino led him to disagree with that assessment. (*Id.*, Ex. 20 at 58).  Father

Tiemann testified that he believed the rector's opinion expressed "what was acceptable in a

particular culture, and that perhaps in the United States the range of acceptance might be

wider than it would be in Colombia." (*Id.*, Ex. 20 at 58–59).

---

[22]  When asked whether there were "procedures written down anywhere that I could look to" for
admitting Patino, Monsignor Rossi answered that "there's no one set of specific policies that would be
applicable in all cases." (Docket Entry No. 98, Ex. 21 at 35–36).

Father Tiemann sent Patino to Dr. Gregory Lester for a psychological evaluation, which was standard procedure for seminary candidates. (Docket Entry No. 98, Ex. 20 at 59–60). Father Tiemann could not recall if he had provided Father Gaviria's letter to Dr. Lester. (*Id*., Ex. 20 at 60). Dr. Lester evaluated Patino in November 1994 but did not provide his written report to the Diocese until February 1995. (*Id*., Ex. 20 at 66–67). During that period, Patino was not involved in any pastoral duties. Instead, he was learning English at the local community college. (*Id.*, Ex. 20 at 67).

On February 6, 1995, Dr. Lester provided his written report on Patino to Father Tiemann. Dr. Lester's report noted that because the testing was done through a translator, "the testing is interpreted cautiously and should be used only as an adjunct to behavioral and personally gathered information, as the precision of testing is generally lowered when cross-cultural issues are involved." (Docket Entry No. 98, Ex. 2 at 1). Dr. Lester stated in the report that Patino told him that in the seminary in Colombia, he "had problems with the Rector" who "didn't like him" and who "suspected he was gay." (*Id*., Ex. 2 at 1). Dr. Lester wrote that Patino had "no counseling, no serious dating relationships, and has had many friends. He denies homosexuality, although he complains that others have approached him, thinking that he is gay. He denies pedophilic feelings or behavior." (*Id*., Ex. 2 at 2). Dr. Lester reported that Patino responded to the testing in a "defensive" way, meaning "a way designed to minimize his faults and shortcomings and to deny psychological problems or conflicts." (*Id.*, Ex. 2 at 2). Dr. Lester concluded:

10

Mr. Patino's scores suggest that he is not very aware of many of his feelings and motivations. The result may be that these feelings may build up under his consciousness, and ultimately express themselves inappropriately. It is unclear what such feelings or impulses might be involved for Mr. Patino, but the difficulties reported in his past involve authority and sexuality. He stated that other tend to "think he's gay" although he states that he is not, and that a Rector simply "didn't like him." The presence of these issues and the possibility of his past difficulties involving more than this simple interpretation suggest that there may be issues to which Mr. Patino is not aware of [sic]. As a result, if Mr. Patino does continue in seminary studies, he may need to be supervised closely and his progress monitored regularly. While the current testing is limited in its conclusiveness about the nature of such issues, there are sufficient indications of issues present for Mr. Patino that are not expressed or defined or conscious, that caution should be used in proceeding with him.

(*Id.*, Ex. 2 at 3–4). Father Tiemann testified that he interpreted Dr. Lester's report as recommending that "[i]f you're going to take him, supervise him closely" and that "we should be very cautious about proceeding with him." (*Id.*, Ex. 20 at 77).

After receiving the report from Dr. Lester, Father Tiemann sent his own recommendation on Patino to the advisory board on February 17, 1995. (Docket Entry No. 102, Ex. 7). Father Tiemann forwarded the reference from the seminary that Patino had briefly attended in Colombia and summarized Father Gaviria's remarks as stating that Patino showed "a certain delicacy" in his manner; Father Tiemann put this phrase in quotation marks. (*Id.*, Ex. 7). Father Tiemann wrote that the results of Patino's psychological evaluation "were mixed and Dr. Lester is concerned because 'there are sufficient indications of issues present that are not expressed or defined or conscious, that caution should be used

in proceeding with him.'" (*Id.*, Ex. 7). "While none of the references are negative, none of them are very strong either. His psychologicals are inconclusive. He must be judged on his behavior during this past year." (*Id.*, Ex. 7). Father Tiemann wrote that Patino had "demonstrated pastoral abilities in his weekend/holiday assignment at St. Pius V Church. He has shown the ability to teach and he takes initiative in meeting people." (*Id.*, Ex. 7). Father Tiemann concluded: "I am uncertain about accepting Juan-Carlos as a seminarian for the Diocese of Galveston–Houston. If he is accepted, I suggest that he spend 2 years perhaps in seminary formation or highly supervised pastoral ministry, taking some theology classes in English and participating in formation, including CPE [Clinical Pastoral Education]." (*Id.*, Ex. 7).

The advisory board approved the selection of Patino for the pastoral internship as part of his work toward ordination. Monsignor Rossi was on the advisory board that interviewed Patino. (Docket Entry No. 98, Ex. 21 at 22–24). The board did not write a report or minutes. (*Id.*, Ex. 21 at 29, 30). Patino was assigned to St. Francis de Sales parish under the supervision of Monsignor Pickard. The record does not show what instruction was given to Monsignor Pickard or whether he knew about Dr. Lester's report or Father Tiemann's evaluation and recommendations.

In his deposition, Father Tiemann was asked whether Monsignor Pickard was required to "give any kinds of evaluations or monthly reviews or anything of that nature." (Docket Entry No. 98, Ex. 20 at 30). Father Tiemann answered that he could not recall such a requirement but that "the assumption was, and I believe it was carried out, that Father

12

Pickard would make the evaluations." (*Id.*, Ex. 20 at 30). Father Tiemann testified that he could recall only one written evaluation but there may have been additional verbal reviews. (*Id.*, Ex. 20 at 30–31). Father Tiemann testified that he believed Patino would be adequately supervised because he would be living in the rectory near Monsignor Pickard. (*Id.*, Ex. 20 at 91–92). "By nature, to place a man in a rectory with a pastor means he is being highly supervised. By the fact that we chose Father Pickard as a former formation director, that was our interpretation of highly supervised, that we had a man who had been forming seminarians to be the one to supervise him." (*Id.*, Ex. 20 at 91–92).

Monsignor Rossi testified that Patino's duties included reading "the scriptures, the Old Testament, readings at Mass. He would receiving [sic] the ministry of acolyte, which would allow him to be an extraordinary minister of the Eucharist. Now these are both things that lay people can do." (Docket Entry No. 98, Ex. 21 at 57). The evidence shows that Monsignor Pickard also described Patino to parishioners as someone who would be working with youth and youth groups. (*Id.*, Ex. 11 at 77; *id.*, Ex. 18 at 51–54; *id.*, Ex. 19 at 79–81).

Before the first report of abuse, Monsignor Pickard had recommended Patino to be ordained as a deacon, expressing reservations only about Patino's English-language skills. (Docket Entry No. 98, Ex. 8). The Archdiocese Defendants testified that until the first report of abuse, they had no suspicion that Patino was abusing boys in the church.

### B.    The Abuse

The plaintiffs have provided similar accounts of the events leading up to Patino's abuse and of the abuse itself. Doe I's mother worked at St. Francis and the family belonged

to the church.  Doe I was sexually abused by Patino in May 1996, when he was 14 years old and in eighth grade.  (Docket Entry No. 102, Ex. 24 at 1; *id.*, Ex. 13 at 8–10).  The evidence showed that Patino was extremely friendly to Doe I at church and frequently suggested that they meet in Patino's rooms.  Patino frequently asked Doe I when they were going to meet at Patino's "place" to "talk about issues."  (*Id.*, Ex. 13 at 99–101).  Doe I testified that Patino asked him to meet at least 20 times and also asked Doe I's mother.  (*Id.*, Ex. 13 at 101–02).  Doe I's mother testified that Patino repeatedly asked her to send Doe I to meet with him.  (*Id.*, Ex. 11 at 93).  She testified that no one else at "St. Francis since the year that I was there insisted so much for any of my sons to leave with them."  (*Id.*, Ex. 11 at 94–95).

Doe I's mother did not believe that her son needed any counseling.  She finally agreed to have Doe I meet with Patino because Doe I played soccer and she thought that Patino could talk to her son about soccer.  Doe I's mother testified that in response to Patino's insistence, she thought, "[Doe I], why don't you go talk about your teammates, about how well you been playing and since [Patino]'s from Colombia, in Colombia they have a very good soccer team, he can give you some hints, some help."  (Docket Entry No. 98, Ex. 11 at 94).  Doe I's mother also thought that it would be good for her son to get advice on a "spiritual level."  (*Id.*, Ex. 11 at 95–96).  Doe I's father testified that he thought Doe I met with Patino to discuss "good things" and to have "a healthy discussion about behavior and how kids should behave."  (*Id.*, Ex. 12 at 57–59).  Doe I's father testified that he did not believe Doe I needed professional counseling.  (*Id.*, Ex. 12 at 58).  When Doe I's mother

finally agreed to allow Patino to "counsel" her son, Patino took Doe I to Patino's living quarters and sexually abused him.  (Id., Ex. 13 at 117–28).

Doe II was abused in late March and again in late April 1996, around the time he turned 14.  (Docket Entry No. 98, Ex. 16 at 7, 16–18).  Doe III, the half-brother of Doe II, was abused in March 1996, when he was 11 years old.  (Id., Ex. 17 at ).  The mother of Does II and III testified that Patino approached her and asked her to send Doe II to see him for one-on-one "counseling."  (Id., Ex. 14 at 49).  Doe II's mother testified that she did not believe her sons needed professional counseling for emotional or behavioral problems.  (Id., Ex. 14 at 19–20, 57).  She agreed to have Patino talk to her son when he offered to watch the boy while she attended a prayer group meeting at the church.  Patino said that she could leave Doe II with him "so that I didn't have to have [Doe II] there, that [Patino] could take [Doe II] with him so that he could begin some counseling."  (Id., Ex. 14 at 49).  Doe II's mother testified that she "saw Patino as a religious figure" and "wanted [Doe II] to spend time with a religious person."  (Id., Ex. 14 at 50, 57).  Doe II and III's stepfather testified that their mother told him that "that [Patino] was going to be talking to them, something about counseling or something" and Patino was "something like a psychologist or something like that."  (Id., Ex. 15 at 32).

Doe II testified that his mother told him to talk to Patino about "my behavior and my feelings towards my biological dad."  (Id., Ex. 16 at 100).  Doe II testified that the first meeting was intended to be about "problems at home," such as using bad language, disobeying his mother, and fighting with his brothers.  (Id., Ex. 16 at 105–06).  Patino took

Doe II to a conference room in the church, told him to "pray . . . so that God could forgive [his] sins," and then sexually abused him.  (*Id.*, Ex. 16 at 105).

On the second occasion, Patino took Doe II to what appeared to be Patino's living quarters.  Patino told Doe II that he "was certified to deal with kids in Colombia" and showed Doe II diplomas on the wall.  (*Id.*, Ex. 16 at 116).  He said "that he does this type of treatment to every single kid he helps."  (*Id.*, Ex. 16 at 116).  He then abused Doe II, telling Doe II again "that he did that to every kid he has counseled before and helped."  (*Id.*, Ex. 16 at 117).  After the abuse, Doe II told Patino, "I just want to go home.  If you don't take me home right now, I'm going to start running out of here and I'm going to start screaming and I'm going to find a cop and I'm going to tell them what you did to me."  (*Id.*, Ex. 16 at 118).  Patino "turned around and he started laughing. [He said,] 'Nobody's going to believe you because I'm a priest and nobody's going to listen to a stupid kid that doesn't have any experience in life.  So do not even go there.'"  (*Id.*, Ex. 16 at 118).  Doe II insisted that he wanted to go home.  Patino drove him home and before Doe II went into the house, Patino told him, "Remember, even if you tell somebody, nobody's going to believe you. . . . I've got more credibility than you do because I'm an adult and I'm a servant of God."  (*Id.*, Ex. 16 at 121.)

Doe III testified that after his mother agreed to have him talk to Patino one-on-one, Patino took Doe III to what appeared to be living quarters, offered him a soda, and then abused him.  (Docket Entry No. 98, Ex. 17 at 56–60).  Doe III testified that afterwards, Patino said,  "You don't have to be embarrassed about this because I'm an expert and I do

16

this to a lot of other kids." Doe III testified that Patino showed him a wall of diplomas. (*Id.*, Ex. 17 at 59). Patino also told Doe III that he "shouldn't tell anybody [about the abuse] because it was kind of like a private type of thing," (*id.*, Ex. 17 at 61), and "to keep it private because I was a part of the counseling," (*id.*, Ex. 17 at 66).

Doe IV was abused at the church in late April or early May of 1996, when he was 12. The abuse occurred when he met with Patino for a "counseling session." (Docket Entry No. 98, Ex. 19 at 94–113). Doe IV's mother testified that Patino asked her to send Doe IV for one-on-one counseling at least three times. (*Id.*, Ex. 18 at 55). She encouraged Doe IV to talk to Patino because she wanted her son to get "good God values" and she thought Patino could "be a positive role model." (*Id.*, Ex. 18 at 56). Patino told Doe IV's mother that he had experience in dealing with issues such as drugs, gangs, and sex education. (*Id.*, Ex. 18 at 62). Doe IV's mother testified that her son was not having any emotional problems, and she did not believe Doe IV needed a professional counselor. (*Id.*, Ex. 18 at 54–55).

Doe IV testified that his mother told him to meet with Patino for "consejos," which "is kind of like counseling, but it's more like advice." (Docket Entry No. 98, Ex. 19 at 95). Doe IV testified that he did not have issues that required professional counseling. (*Id.*, Ex. 19 at 94). Doe IV testified that he was supposed to talk to Patino about "problems with teenagers these days." (*Id.*, Ex. 19 at 101–02). Doe IV testified that immediately before abusing him, Patino said, "Don't be peer-pressured into doing drugs or smoking or drinking. Don't be peer-pressured into joining gangs." (*Id.*, Ex. 19 at 111). Patino then abused Doe IV. Afterwards, Patino told Doe VI, "This has to stay between you and me." (*Id.*, Ex. 19 at

108).  Patino took Doe IV to the exit of the rectory and told him again not to tell anyone.  (*Id.*, Ex. 19 at 108–09).

None of the children reported what Patino had done until May 1996, when Doe I told his parents.  They promptly contacted Monsignor Pickard.  The evidence as to whether the Archdiocese Defendants reported the abuse is disputed, as described below.

### C.   The Evidence as to the Defendants' Report of the Abuse to Authorities

Monsignor Rossi testified that Doe I's parents met with Monsignor Pickard on Tuesday, May 28, 1996, and reported that Patino had sexually abused Doe I the day before.  (Docket Entry No. 98, Ex. 21 at 134).  Bishop Fiorenza, Monsignor Rossi, and Father Tiemann were notified on Wednesday, May 29.  (*Id.*, Ex. 21 at 133–35; *id.*, Ex. 22 at 100–01).

When confronted, Patino at first admitted that contact with Doe I had occurred but claimed that it was not sexual in nature.  Patino quickly confessed that the contact with Doe I had sexual.  (Docket Entry No. 98, Ex. 21 at 85).  On either that same day or the following day, Patino was dismissed from his position at St. Francis.  The Archdiocese arranged for Patino to stay at a residential treatment facility operated by a priest, Father Davila, unrelated to the parish.  (*Id.*, Ex. 20 at 134).  Monsignor Rossi testified that the Archdiocese Defendants "wanted [Patino] immediately out of St. Francis de Sales parish, because there are minors on the premises.  There's a day school there.  So we did not want him there."  (*Id.*, Ex. 21 at 90).  Monsignor Rossi testified that he wanted Patino to stay in the residential facility "for a short period of time while we gave law enforcement the opportunity that they

18

needed." (*Id.*, Ex. 21 at 90). Despite this professed desire to make Patino available to law enforcement, neither Monsignor Rossi nor other Archdiocese Defendants placed any restrictions on Patino's movements during this period. Monsignor Rossi testified that he believed he had no authority to do so because he had dismissed Patino. (*Id.*, Ex. 21 at 128–30). While at the facility, Patino received counseling. (*Id.*, Ex. 21 at 156).

On May 30, 1996, the day after Monsignor Pickard and Father Tiemann met with Doe I and his parents, Monsignor Pickard told Monsignor Rossi about the meeting. (Docket Entry No. 98, Ex. 21 at 135).[23]  Monsignor Rossi testified that the allegation was serious enough to warrant notifying CPS, but he did not do so himself. (*Id.*, Ex. 21 at 78, 88). Monsignor Rossi relied on Monsignor Pickard to contact law enforcement. As noted, Monsignor Pickard is not available as a witness. Monsignor Rossi took notes of what Monsignor Pickard told him and testified about those conversations in his deposition.[24]

---

[23]The plaintiffs have objected to Exhibit 21to the Archdiocese Defendants' summary judgment motion, excerpts of the deposition of Monsignor Rossi, as hearsay. The plaintiffs ask this court to exclude the portions of his deposition that reference reports made to CPS because Monsignor Rossi lacked personal knowledge of those reports. (Docket Entry No. 103 at 3). The defendants respond that Monsignor Rossi had personal knowledge of what he had been told and that his testimony is not proffered to show the truth of the matter asserted but to show the information he had been given. (Docket Entry No. 107 at 3). The objection is overruled and the deposition testimony is admitted for this limited purpose.

[24]The plaintiffs have objected to Exhibit 9 attached to the Archdiocese Defendants' summary judgment motion, Monsignor Rossi's handwritten and typed notes, on the basis that they are not authenticated or sworn and are hearsay. (Docket Entry No. 103 at 2). In response, the defendants argue that the deposition testimony of Monsignor Rossi authenticates the notes and that they are not subject to exclusion as hearsay because they are not proffered for the truth of the matter asserted but instead to show what information the Archdiocese Defendants had. (Docket Entry No. 107 at 2). The plaintiffs in turn argue that the deposition only generally refers to the notes. (Docket Entry No. 111 at 1). Monsignor Rossi's testimony lays the necessary predicate for some of the notes. He discusses in depth Bates-numbered documents DIO0048 and 0156–161. (Docket Entry No. 98, Ex. 21 at 121–28, 134). However, the remaining documents, Bates-numbered DIO0040, 0041, 0043, 0045, 0047, and 0056 are not authenticated in the deposition or elsewhere. These documents are excluded. This court admits DIO0048 and 0156–0161 for a limited purpose. The

According to Monsignor Rossi, Monsignor Pickard had told the Doe I family that they could report the abuse to CPS, but if they were not going to make a report, "we felt obliged to report it." (*Id.*, Ex. 21 at 142). Doe I's parents testified that they did not report the abuse to CPS or to the police but relied on the Church officials to make the reports. Doe I's mother testified that when she met with Father Tiemann, he advised her, "You know that you can report this, right?" (*Id.*, Ex. 11 at 111). Doe I's mother responded, "I'm leaving everything to your hands. All I want is not for my son to be in the news, all over the news, because he just finished the eighth grade; and I don't want that kind of publicity. Everything, I'm leaving everything into your hands." (*Id.*, Ex. 11 at 111–12).

Monsignor Rossi testified that Monsignor Pickard stated that he had called Children's Protective Services and had "made the report and was told that someone would call him back." (Docket Entry No. 98, Ex. 21 at 142). Monsignor Rossi testified that he believed that Monsignor Pickard had reported the abuse to CPS on either May 29 or 30. (*Id.*, Ex. 21 at 76–78, 142–43). On May 31, 1996, Monsignor Pickard told Monsignor Rossi that CPS would be contacting the Houston Police Department. (*Id.*, Ex. 21 at 146–47). His typed notes for the events surrounding Doe I's report of the abuse state that "CPS could not call the parents but would call HPD and that it was up to HPD to call the parents for an investigation." (*Id.*, Ex. 9 at DIO0048). The Archdiocese Defendants did not contact HPD.

Although Monsignor Rossi testified that it was agreed that Monsignor Pickard was

plaintiffs' objection to Exhibit 9 is sustained in part.

the person who should report the abuse, (*id.*, Ex. 21 at 76), Father Tiemann also testified that he called the CPS hotline and described what he knew about the abuse and where Patino could be found.  (*Id.*, Ex. 20 at 126–28).  Father Tiemann had no personal knowledge as to whether Monsignor Pickard had called CPS or not.  (*Id.*, Ex. 20 at 126).

Monsignor Rossi testified that in June 1996, he was advised that HPD would not be pursuing the abuse allegation because Doe I's family refused to cooperate in the police investigation.  (Docket Entry No. 98, Ex. 21 at 169–70).  A June 18, 1996 letter sent to Monsignor Rossi by counsel for the Archdiocese states that "HPD contacted the father of the complainant, and he refused to answer questions or allow an interview with his son. Therefore, the police cannot move forward due to lack of evidence." (*Id.*, Ex. 10).[25]  Doe I's parents deny that they were contacted by CPS or HPD.   Doe I's testified that no one from either CPS or the police contacted them until after Doe I filed this suit.  (*Id.*, Ex. 11 at 118–21).

The plaintiffs have produced an affidavit from the custodian of records at the Texas Department of Family and Protective Services.  (Docket Entry No. 102, Ex. 15).  That affidavit states that there are no records about Doe I, who is identified by his full name, birthdate, and social security number in the request for records.  (*Id.*, Ex. 15).  An additional

---

[25]The plaintiffs have objected to Exhibit 10 to the defendants' summary judgment motion, the letter from counsel to Monsignor Rossi, on the grounds that letter is unsworn and is hearsay.  (Docket Entry No. 103 at 3).  A proper predicate for the letter is provided by Monsignor Rossi's deposition testimony.  (Docket Entry No. 98, Ex. 21 at 168–69).  The defendants have not offered the letter as evidence of the truth of its contents but for the limited purpose of showing the information Monsignor Rossi had.  (Docket Entry No. 107 at 2).  The plaintiffs' objection to Exhibit 10 is overruled.

21

affidavit states that the Texas Department of Family and Protective Services conducted a thorough and diligent search of the records of Children's Protective Services, Adult Protective Services, Child Care Licensing, and Residential Child Care licensing and found no records on Doe I. (*Id.*, Ex. 15). The plaintiffs have also produced an affidavit from the custodian of records for the Houston Police Department. (*Id.*, Ex. 16). In that affidavit, the custodian states that there are no records of a 1996 investigation about a person with Patino's name, date of birth, and social security number. (*Id.*).

In response, the Archdiocese Defendants submitted additional evidence that Monsignor Rossi believed in May and June 1996 that the Archdiocese Defendants had "made repeated efforts beyond the initial report to ensure the matter was being followed up by CPS." (Docket Entry No. 109 at 19). This evidence—entries in records of Patino's counseling after Doe I came forward—includes a counselor's handwritten notes that Monsignor Rossi "report[ed] that the allegations were reported to Children's Protective Services and to the HPD." (*Id.*, Ex. 23 at CC00003).[26]

---

[26]The plaintiffs have objected to this evidence. First, they object to Exhibits 23 and 24 on the basis that they were submitted in the defendants' reply brief. (Docket Entry No. 112). The plaintiffs argue that the defendants cannot submit new evidence in a reply brief under the local rules. Local Rule 7.7 states that "[i]f a motion or response requires consideration of facts not appearing of record, proof by affidavit or other documentary evidence must be filed with the motion or response." Local Rule 7.8 provides that "[t]he Court may in its discretion, on its own motion or upon application, entertain and decide any motion, shorten or extend time periods, and request or permit additional authority or supporting material." Exhibit 24 was submitted to authenticate previously submitted evidence after the plaintiffs objected to it. Exhibit 23 was submitted to respond to the plaintiffs' challenges to Monsignor Rossi's notes and testimony as inadmissible and as recent fabrications. (Docket Entry No. 102 at 8, 29). Because Exhibits 23 and 24 were submitted to respond to the plaintiffs' arguments raised in their response to the defendants' summary judgment motion, Local Rule 7.8 supports their admission.

The plaintiffs also objected to Exhibit 23, records of Patino's treatment, as hearsay and, as to the entries that refer to statements made by Monsignor Rossi, double hearsay. (Docket Entry No. 112 at 2–4). The records are accompanied by an affidavit by Michael J. Pieri, custodian of the records of Catholic

On June 14, 1996, Monsignor Rossi had a conversation with Father Davila, who ran the residential facility where Patino was staying.  Father Davila told Monsignor Rossi that Patino was "very remorseful about the incident, he plans to immediately return to Colombia because he feels his mother will try to come see him here."  (Docket Entry No. 98, Ex. 21 at 126).  On June 26, 1996, Monsignor Rossi talked to Patino, who said that he had a return ticket to Colombia originally scheduled for July 20, but which he changed to July 7.  (*Id.*, Ex. 21 at 127–28).  Monsignor Rossi "expressed a willingness to assist in the cost of the ticket." (*Id.*, Ex. 21 at 128).  Patino's current location is unknown.

### D.    The Evidence as to the Defendants' Internal Response to the Report of Abuse

As noted, on either Wednesday, May 29 or Thursday, May 30, 1996, Patino was dismissed and physically removed from St. Francis de Sales Parish Church.  (Docket Entry No. 98, Ex. 21 at 90–91, 137).  Doe II, Doe III, and Doe IV had not told anyone about the abuse.  Does II and III and their mother learned of Patino's departure at a Spanish-language

---

Charities. (Docket Entry No. 109, Ex. 23 at 5–6).  Pieri's affidavit lays the necessary predicate for admission as a record of regularly conducted activity under Fed. Rule. Evid. 803(6).  The plaintiffs argue that the affidavit is insufficient because Pieri answered "To the best of my knowledge" to the questions "Were these records made at or near the time of the performance of the act recorded therein or reasonably soon thereafter?" and "Does the source of the information, and the method and circumstances of its preparation establish a trustworthiness [sic] of the records?"  (*Id*. at 6).  "A qualified witness is one who can explain the system of record keeping and vouch that the requirements of  Rule 803(6) are met; the witness need not have personal knowledge of the record keeping practice or the circumstances under which the objected to records were kept."  *U.S. v. Box*, 50 F.3d 345, 356 (5th Cir. 1995) (citing *U.S. v. Iredia*, 866 F.2d 114, 119–20 (5th Cir.), *cert. denied*, 492 U.S. 921 (1989)).  The affidavit Pieri submitted is sufficient.   The double hearsay objection is overruled on the ground that the statements about reports made to the authorities are not offered for the truth of the contents, but rather for the limited purposes of rebutting a claim of recent fabrication, *see, e.g.*, *U.S. v. Palumbo*, 100 F.3d 942, 942 (2d Cir. 1996), and of showing that Monsignor Rossi believed a report had been made.

mass at which Patino spoke.  (*Id.*, Ex. 14 at 62–64; *id.*, Ex. 16 at 125–26; *id.*, Ex. 17 at 72–73).  The mother of Does II and III testified that Patino explained that he was leaving because he needed to "take care of some affairs" in Colombia.  Monsignor Pickard was present and performed the mass.  (*Id*. at 63).  Doe IV's mother testified that Monsignor Pickard told the congregation at a Spanish-language mass that Patino would no longer be at St. Francis, but did not say why.  (*Id.*, Ex. 18 at 17–19).

The mother of Does II and III testified that the Monday after the Sunday mass announcing his departure, Patino came to her house to say goodbye.  (Docket Entry No. 98, Ex. 14 at 62).  Patino asked to speak to Does II and III, but the boys would not come out of their rooms.  (*Id.*, Ex. 14 at 65).

Doe IV's mother saw Patino at a bakery two blocks from the church after the mass announcing his departure.  (Docket Entry No. 98, Ex. 18 at 20–22, 95).  Patino was wearing a clerical collar.  (*Id.*, Ex. 18 at  at 95, 99).  Doe IV's mother testified that there were rumors at the church that Patino had abused a child.  Patino told Doe IV's mother that he "felt bad because they were saying things—bad things about him, those things that he hadn't done." (*Id.*, Ex. 18 at 22).  Doe IV's mother believed that Patino was referring to the rumors about child abuse.  (*Id.*, Ex. 18 at 22).  Patino had previously given Doe IV's mother a photo of himself inscribed, "With lots of love to the [Doe IV's last name] family."  (*Id.*, Ex. 18 at 21, 97).  Patino asked Doe IV's mother not to display the photo in her home until he was gone.  (*Id.*, Ex. 18 at 21).  Shortly after he left, Patino sent Doe IV's mother a letter from Colombia.  In that letter, Patino stated that his mother was in bad health because of the things people had

said about him, that he was restarting his life, and that he was glad Doe IV's mother did not believe the things people had said about him.  (*Id.*, Ex 18 at 16–17).  Doe IV's mother displayed the picture of Patino in a "very special place in my apartment, in a section that I always dedicate to family, people that I love, friends" for "years."  (*Id.*, Ex. 18 at 25–26).  Doe IV's mother testified that if Monsignor Pickard had told the St. Francis parishioners that Patino was leaving because of accusations of abuse, she would have immediately talked to her son and "taken or assumed, correct, a different attitude."  (*Id.*, Ex. 18 at 98).  Doe IV's mother testified that she would have immediately called the police if she had known Doe IV was abused.  (*Id.*, Ex. 18 at 98).  She added that if parents of the abused boys had received correct information about Patino, the police could have captured him.  (*Id.*, Ex. 18 at 98).

Monsignor Rossi testified that the Archdiocese Defendants did not notify parishioners of the allegations of abuse made against Patino, instead issuing a statement that Patino would not become a deacon.  In his deposition, Monsignor Rossi explained why:

> One of the challenges we had was that the family [of Doe I] was very, very clear with us that they did not want any publicity.  They did not want anything to happen that could possibly identify their son as having had this encounter with Patino.  We were trying to be very sensitive to their needs.  They were very clear with us that they weren't going to cooperate with law enforcement, that they did not want their son or their family name to be put out there in the public forum.  But they were unaware of anyone else with whom this may have occurred.
>
> Patino, himself, told me that there were no—there was no one else, that this was not a pattern on his part.  At that point, there was no—I had no reason to doubt the veracity of his statement.

>So the decision that we made was to put something in the parish bulletin that would at least say to the parishioners that this man is not going to be ordained, that something has occurred, that he is not going to be ordained.
>
>Is it the most that we would have wanted to have put? No. But we were trying to respect the family and their desire for anonymity. So we did the best we could given the information we had.

(Docket Entry No. 98, Ex. 21 at 94–95). That bulletin, issued on Sunday, June 9, 1996,

stated:

>It saddens me to inform you that despite having previously invited you to attend the diaconate ordination of Juan Carlos Patino here on June 29th, he will not be ordained. The other two will be ordained here and you are invited to attend. Juan Carlos Patino has been notified that he is no longer a seminarian for the Diocese of Galveston-Houston. I am grateful to Juan Carlos for the good he did while in the parish and pray that God's grace will give him peace. I ask that you also pray for Juan Carlos and for our parish community.

(Docket Entry No. 21, Ex. 21 at 98–99).

In 2004, Does II and III came forward with allegations of abuse by Patino in 1996.

(Docket Entry No. 98, Ex. 14 at 76–84). On June 2, 2004, this suit was filed in state court.

Another bulletin was issued to St. Francis parishioners on August 8, 2004, after this

lawsuit was filed. That bulletin was written by Monsignor Rossi. It said:

>Recently a lawsuit was filed against the Diocese of Galveston-Houston alleging sexual abuse of a minor made by Juan Carlos Patino that occurred in May 1996. Juan Carlos was a seminarian who worked at St. Francis de Sales Church at the time the alleged abuse took place. It is deeply saddening that any person may have been harmed by the actions of Juan Carlos. Juan Carlos resided at St. Francis de Sales Church from September 1995 through May 1996. Any parishioner who is

26

> aware of someone who may have been abused by Juan Carlos
> Patino is asked to call the diocesan victims assistance
> coordinator, Sister Maureen O'Connell, at 713-659-5461,
> extension 499.  Please keep in your daily payers all the victims
> of sexual abuse.

(Docket Entry No. 98, Ex. 21 at 99-100 ).

This suit was removed to federal court on March 25, 2005.  (Docket Entry No. 1).

Doe IV came forward with allegations of abuse in May 2005.  (Docket Entry No. 98, Ex. 18

at 76; *id.*, Ex. 19 at 115).  Doe IV was added as a plaintiff on July 28, 2006.  (Docket Entry

No. 91).  After discovery, the Archdiocese Defendants moved for summary judgment.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the

moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c).  The

movant bears the burden of identifying those portions of the record it believes demonstrate

the absence of a genuine issue of material fact."  *Lincoln General Ins. Co. v. Reyna*, 401 F.3d

(5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  If the burden of

proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary

documents that negate the existence of some material element of the opponent's claim or

defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden

of proof at trial, demonstrate that the evidence in the record insufficiently supports an

essential element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary

judgment must demonstrate the absence of a genuine issue of material fact, but need not

negate the elements of the nonmovant's case.  *Bourdeaux v. Swift Transp. Co., Inc.,* 402 F.3d

536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 535 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence." *Young v. Exxonmobil Corp.*, 155 Fed. Appx. 798, 800 (5th Cir. 2005).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Young*, 155 Fed. Appx. at 800. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Beard v. Banks*, 126 S.Ct. 2572, 2578 (2006) (quoting *Celotex*, 477 U.S. at 322).

28

### III.     The Negligent Hiring/Assignment and Supervision Claims

In the third amended complaint, the plaintiffs allege that the Archdiocese Defendants were "negligent in recruiting, screening, employing, assigning, and supervising [Patino]," (Docket Entry No. 95 at ¶ 5.02), and that Bishop Fiorenza and Monsignor Pickard "negligently failed to warn Plaintiffs," (*id.* at ¶ 5.04).[27]   The plaintiffs allege that the defendants' actions were grossly negligent , with "conscious indifference to the rights, safety or welfare of the Plaintiffs."  (*Id.* at ¶ 11.01).

The elements of a negligence cause of action are a duty, a breach of that duty and damages proximately caused by that breach.  *Doe v. Boys Clubs of Greater Dallas*, 907 S.W.2d 472, 477 (Tex. 1995); *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990).  The Archdiocese Defendants argue that the plaintiffs are unable to raise a fact issue as to whether the risk that Patino would sexually abuse children was reasonably foreseeable or whether the plaintiffs' injuries were proximately caused by the defendants' actions and omissions.  (Docket Entry No. 98 at 4).  The Archdiocese Defendants also argue that as a matter of law, they did not owe a duty to investigate Patino, merely not to "negligently recommend" him.  (*Id.* at 10).  The plaintiffs have responded to both arguments.

#### A.     The Negligent Hiring/Assignment and Supervision Claim

##### 1.     *The Duty to Investigate before Accepting Patino as a Pastoral Intern*

---

[27]This court addresses the defendants' alleged duty to the plaintiffs to warn them of the danger posed by Patino in the section of this opinion regarding premises liability.  Premises liability and negligence require "closely related but distinct duty analysis."  *Western Inv., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).

The Archdiocese Defendants rely on *Golden Spread Council v. Akins*, 926 S.W.2d 287 (Tex. 1996), to support their argument that they had no duty to investigate Patino but merely "not to negligently recommend" him.  In that case, a local council of the Boy Scouts of America recommended a scoutmaster for a church's scout troop,  despite having received a report that the applicant was "messing with" boys.   The person was selected as a scoutmaster and abused several boy scouts, whose parents then sued the local council.  The Texas Supreme Court rejected the claim that the council had a duty to investigate the scoutmaster before recommending him for the post.  The court emphasized that the Boy Scouts of America has 1,300,000 adult volunteers about whom the organization has little or no knowledge.  *Id.* at 290.  The court agreed that the local scout council had a duty not to negligently recommend a volunteer as a scoutmaster but did not impose any other duty on the local council, including a duty to investigate the volunteer's fitness to be a scoutmaster. *Id.* at 291–92.  The court noted that recommending a volunteer as a scoutmaster did "not fit within the boundaries of the negligent hiring doctrine."  *Id.* at 290.  The defendants argue that this case is controlled by *Akins*.  (Docket Entry No. 98 at 11).

This case is distinguishable from *Akins.*  In this case, the Archdiocese Defendants did not merely "recommend" Patino as a pastoral intern and seminarian to a third party, which made the decision to select Patino.  To the contrary, the Archdiocese Defendants themselves selected Patino for that internship after investigating his qualifications and fitness as a seminarian training for the priesthood.  The Archdiocese Defendants investigated Patino's background, interviewed him, had him evaluated by a psychiatrist, and presented him to an

advisory board.  The Archdiocese Defendants made the decision to accept Patino as a seminarian and pastoral intern and assigned him duties to perform under their supervision and control.  The Archdiocese Defendants did not merely recommend Patino to a third party; the Archdiocese Defendants themselves investigated and evaluated Patino and made the decision to select him as a pastoral intern and to assign him to St. Francis, subject to their supervision.  The relationship between Patino and the Archdiocese is much more like that of an employee and employer than was the relationship between the volunteer scoutmaster and the third-party scout troop involved in *Atkins*.  In distinguishing *Akins* from cases involving an employer–employee relationship, the Texas Supreme Court noted that "an employer who negligently hires an incompetent or unfit individual may be liable to a third party whose injury was proximately caused by the employee's negligent or intentional act." 926 S.W.2d at 294 (Enoch, J. concurring in part and dissenting in part) (citing  *Salinas v. Fort Worth Cab & Baggage Co.*, 725 S.W.2d 701, 703–04 (Tex. 1987); *King v. McGuff*, 234 S.W.2d 403, 405 (1950); *Dieter v. Baker Serv. Tools*, 739 S.W.2d 405, 408 (Tex. App.—Corpus Christi 1987, writ denied); *Estate of Arrington v. Fields*, 578 S.W.2d 173, 178 (Tex. Civ. App.—Tyler 1979, writ ref'd n.r.e.)).  The defendants' argument that under *Akins,* they had no duty with respect to Patino other than not to negligently recommend him, is unpersuasive.

The issue raised by the summary judgment motion and evidence is not whether the defendants breached a duty to investigate Patino.  The undisputed evidence shows that the Archdiocese Defendants *did* investigate Patino.  They contacted the rector of the seminary

from which Patino had been expelled eight years earlier; contacted Patino's other references; obtained and verified information about his background; and had him evaluated by a psychiatrist. The record does not suggest that had the Archdiocese Defendants investigated more thoroughly, they would have uncovered additional information showing Patino's propensity to abuse children, such as prior reported incidents or complaints of such abuse. There is no indication that there were any such prior incidents or complaints involving Patino. The issue in this case is whether the information the defendants did learn through the investigation they conducted made it reasonable for them to anticipate that, if selected as a pastoral intern, Patino would sexually abuse children he would encounter in that role. This requires examining the information the Archdiocese Defendants learned about Patino during and after the selection process and the information that became available to the Archdiocese Defendants about how Patino conducted himself during his internship. *See, e.g.*, *Doe v. Boys Clubs of Greater Dallas*, 907 S.W.2d 472, 478 (Tex. 1995).

## 2.    *Foreseeability and Cause-in-Fact*

The defendants argue that even if they had a duty to investigate Patino before selecting him as a seminarian and pastoral intern, they were not negligent because the risk that he was a sexual predator was not reasonably foreseeable. Relying on *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472 (Tex. 1995), the defendants argue that their decision to select Patino and assign him to the pastoral internship could not have been a proximate cause of the plaintiffs' abuse by Patino because the risk of that abuse was not foreseeable and because the defendants did not cause the abuse other than by placing Patino at the church.

32

(Docket Entry No. 98 at 4–5).  The defendants characterize *Boys Club of Dallas* as standing for the proposition that "[i]n cases involving physical and/or sexual assault courts have found foreseeability only where the defendant had knowledge of prior similar physical or sexual behavior."  (Docket Entry No. 98 at 4).  The court in *Boys Club* did not, however, hold that the defendants could not reasonably foresee the likelihood of abuse.  Instead, the court concluded that even if the defendants should have foreseen the risk of abuse and were negligent in accepting the volunteer, their action was not the cause-in-fact of the abuse the plaintiffs suffered.  907 S.W.2d at 478.  Instead, the defendants' action merely led to the volunteer's presence at the club, a "preliminary condition in the course of events which made possible his assaults."  Id. at 477–78.  Both foreseeability and cause-in-fact are necessary elements of negligence.

### a.      Foreseeability

Absent a showing of a foreseeable risk, a defendant as a matter of law cannot be liable for negligently failing to take reasonable precautions to protect against that risk.  *See, e.g.*, *Greater Houston Transp. Co. v. Phillips*,  801 S.W.2d 523, 527 (Tex. 1990) (holding that a taxi company had no duty to advise its drivers not to carry illegally concealed weapons; given that there had been only one incident in twenty years involving a weapon, the court could not "conclude that the risk of harm (injury) to others was foreseeable"); *Houser v. Smith*, 968 S.W.2d 542 (Tex. App.–Austin 1998) (in determining whether an employer was liable for an after-hours sexual assault by a transmission mechanic at the workplace, the court considered whether the "criminal conduct and the type of harm that befell [the victim] were

foreseeable and presented a risk that [the employer] was required to guard against by investigating [the employee's] criminal background" and held that the risk of assault was not foreseeable); *see also Beach v. Jean*, 746 A.2d 228, 234 (Conn. Super. Ct. 1999) (finding no liability for negligent hiring of a priest who molested a nine-year-old boy when "the [defendant church] received written assurances from both [the priest's] seminary and from an independent investigation that [the priest] had the moral character, fitness and ability to serve as a competent priest and to relate to children appropriately").

The question of foreseeability "involves a practical inquiry based on common experience applied to human conduct." *Read v. Scott Fetzer Co.*, 990 S.W.2d 732, 737 (Tex. 1998) (internal quotations and citations omitted). In *Read*, the plaintiff was sexually assaulted by a door-to-door vacuum cleaner salesman. The defendant vacuum cleaner manufacturer hired sales people to perform in-house demonstrations, and the dealers "gain[ed] access to [a] home by virtue of the [manufacturer's] name." *Id.* Given these circumstances, the Texas Supreme Court found that "[a] person of ordinary intelligence should anticipate that an unsuitable dealer [in door-to-door vacuum cleaner sales] would pose a risk of harm" to customers in their homes. *Id.* The court affirmed the lower court's finding of negligence.

In judging whether the risk of an employee harming another person is foreseeable, courts have also considered the vulnerability of those who would likely be exposed to that employee. *See, e.g.*, *Porter v. Nemir*, 900 S.W.2d 376, 386 (Tex. App.—Austin 1995, no writ) (finding that the defendants, who ran an out-patient drug and alcohol program, "had a

34

heightened obligation to hire and retain competent counselors because their program treated psychologically frail clientele"); *Boys Clubs of Greater Dallas*, 868 S.W.2d at 950–51 ("We recognize that the Club and similar organizations whose primary function is the care and education of children owe a higher duty to their patrons to exercise care in the selection of their employees than would other employers."); *Deerings W. Nursing Ctr. v. Scott*, 787 S.W.2d 494, 495–96 (Tex.App.—El Paso 1990, writ denied) (concluding that employers of counselors for drug treatment and workers in a nursing home had the duty carefully to screen employees because of the vulnerability of their clients).

The issue is whether the information available to the defendants when they selected Patino as an intern, assigned him to St. Francis, and supervised his work there made it reasonable for them to anticipate a risk that Patino would abuse children.  In many cases raising similar allegations, no information was available to defendant church officials who hired a clergy member or employee to suggest a propensity for sexual misconduct.  *See, e.g.*, *Tichenor v. Roman Catholic Church of Archdiocese of New Orleans*, 32 F.3d 953, 960 (5th Cir. 1994) (affirming summary judgment in favor of the archdiocese for a priest's molestation of the minor plaintiff because the priest "was diligent in guarding his secrets" and "[n]o tangible evidence in the form of a criminal history or discipline exists that would have been uncovered in a background check"); *Doe v. Newbury Bible Church*, No. 1:03-CV-211, 2005 WL 1862118, at *7 (D.Vt. July 20, 2005) (finding no liability for negligent hiring because "there is no evidence that the church defendants knew or should have known of [a pastor's] propensity to molest young boys"); *Byrd v. Faber*, 565 N.E.2d 584, 590 (Ohio

35

1991) (affirming the trial court's dismissal of the plaintiff's complaint for failure to state a claim because she "alleged no fact indicating that [the pastor who sexually assaulted the plaintiff] had a past history of criminal or tortious conduct about which the [church defendant] knew or should have known").  Courts have found that evidence of prior crimes or morally questionable acts unrelated to sexual misconduct does not make the risk of sexual misconduct foreseeable.  *See, e.g.*, *Frith v. Fairview Baptist Church*, No. 05-01-01605-CV, 2002 WL 1565664, at *4 (Tex. App.–Dallas 2002, no pet.) (finding that a Sunday school teacher's criminal history, including convictions for burglary and possession of controlled substances, "probably should have called into question his moral fitness as a Sunday School teacher" but would not "have put the Church on notice that he might sexually assault a child"); *Alpharetta First United Methodist Church v. Stewart*, 472 S.E.2d 532, 536 (finding that a suspension from college for cheating on a Hebrew exam and a psychological evaluation revealing "difficulty controlling his impulses, a tendency to use poor judgment, a tendency to disregard the rights of others, and a likelihood to express aggression in a physical manner" was not sufficient to put a church on notice that a pastor who had a sexual relationship with the plaintiff "had a propensity for sexual misconduct.").

In this case, the Archdiocese Defendants did not have—and further investigation would not have uncovered—information that would clearly show Patino's propensity for sexual misconduct toward children, such as prior complaints or incidents of similar abuse. The defendants did, however, have information that Patino had been dismissed from a

36

seminary eight years earlier; that he had a history of confusion by others about his sexual orientation; that he had unresolved sexual issues; and that he should be supervised closely.

The plaintiffs cite *Moses v. Diocese of Colorado*, 863 P.2d 310 (Colo. 1993). In that case, the defendant Church had a psychological report that a candidate had "sexual identification ambiguity." *Id.* at 328. The Church did not circulate this report, or another report about the candidate's depression and low self-esteem, to other Church officials. The court found fact issues as to whether the decision to assign the candidate to serve as a counselor for parishioners was negligent. *Id.* at 328–29. Similarly, in *Evan F. v. Hughson United Methodist Church*, 10 Cal. Rptr. 2d 748 (Cal. Ct. App. 1992), the plaintiff sued a church, alleging negligent hiring of a pastor who had molested the plaintiff when he was 13. The church had hired the pastor to be a youth director. The pastor was a minister who had been working as a counselor at a secular high school. Although the church did not initially know of any issues regarding the pastor, it later "became aware of some difficulty with [his] reappointment to the active ministry and understood that he had been on a sabbatical of some time." *Id.* at 758. Three years later, the pastor molested the plaintiff. The court found that although the church "had no actual knowledge of [the defendant's] past . . . the evidence recounted above presents triable issues of material fact regarding whether the Church had reason to believe [the pastor] was unfit or whether the Church failed to use reasonable care in investigating [him]" before hiring him. *Id.*

The plaintiffs argue that the letter from the rector of the seminary in Colombia stating that Patino had left because he had a "certain delicate manner," and the report from Dr.

Lester concluding that Patino is not "very aware of many of his feelings and motivations," has had difficulties involving "authority and sexuality," and, if accepted to continue seminary studies, "may need to be supervised closely and his progress monitored regularly," create a fact issue as to whether the decision to accept Patino as a pastoral intern and assign him to work that included children was negligent. (Docket Entry No. 102 at 10–12). The plaintiffs have submitted expert reports to support their argument that the Archdiocese Defendants were on notice of Patino's propensity to sexually abuse minors. The reports are by Thomas Patrick Doyle, an ordained Catholic priest, and Aquinas Walter Richard Sipe, a former Catholic priest. (*Id.*, Exs. 11, 14). In those reports, the experts opine that the harm to the plaintiffs was foreseeable to the defendants. The defendants object to these expert opinions under Rule 702 of the Federal Rules of Evidence. (Docket Entry No. 108).[28]

Thomas Patrick Doyle, an ordained Catholic priest and retired Air Force major, opines that the defendants were "grossly negligent in meeting their obligations in dealing with [Patino]." (Docket Entry No. 102, Ex. 14 at ¶ 25). Doyle concluded that the defendants followed a pattern of "failure to warn the public when transferring a known abuser from one assignment to another, failure to provide even fundamental pastoral care to victims, failure to honestly report to secular judicial and law enforcement authorities about sexual abusers in the ranks of the clergy and the religious, failure to provide therapeutic intervention in a timely manner or at all, and failure to take extra precautions in examining the credentials and

---

[28]The defendants object to both reports because they rely on and quote hearsay. (Docket Entry No. 108 at 4–6, 9). Expert witnesses may rely on hearsay in forming their opinions. *LaCombe v. A-T-O, Inc.*, 679 F.2d 431, 436 n.5 (5th Cir. 1982) (internal citation omitted).

qualifications of candidates for positions including offices such as the ones held by Defendant Patino." (*Id.*, Ex. 14 at ¶ 27). "[I]t is my opinion that the Galveston-Houston diocese was not only negligent but grossly negligent in accepting Patino, an obviously unfit man, to serve in the diocese. The foreseeable result was that John Doe I, John Doe II, John Doe III, and John Doe IV, among others, were sexually abused." (*Id.*, Ex. 14 at ¶ 28).

Aquinas Walter Richard Sipe is a former Benedictine monk and Roman Catholic priest, and counselor and psychotherapist to lay Catholics. (Docket Entry No. 102, Ex. 11 at ¶ 1). Sipe concluded that based on the information the Archdiocese Defendants had when it accepted Patino, the Diocese had notice that Patino could be a danger to minors:

> The diocese of Galveston-Houston had ample indications of the potential danger Patino posed for abusing minors before the diocese employed him and accepted him as a candidate for the priesthood.
> The letter from the seminary Rector in his home country, Columbia [sic], indicated in subtle terms (but were well understood by the clergy) that he had a homosexual orientation ("certain delicate manners"). Further, Patino's educational history was sufficiently unusual to merit special investigation because of his failure to become an ordained priest in his own country.
> The psychological evaluation of candidate Patino that the diocese received from Dr. Greg Lester stated clearly that he needed to be supervised. Again, the questions and concerns about his orientation and ability to monitor (control) himself sexually provided another strong red flag of caution to the Diocese of Galveston-Houston concerning whether and the extent to which Patino should be given supervised access to minors.
> The Diocese's own vocations director's uncertain endorsement of Patino and the requirement that he be "highly supervised" was yet another red flag that signaled a risk of predatory sexual behavior between Patino and minors.

> In the documents I reviewed, I did not see any evidence that the Diocese took reasonable care to investigate, pay attention to danger signals or provide the necessary guidance and supervision needed to protect Patino from himself and minor boys from him.
>
> Based upon the warnings received by the Columbian [sic] Rector, the psychological report of Lester, the cautionary recommendation of vocations director Tiemann and Patino's own unusual educational background and his autobiography, in my opinion, Patino's sexual abuse of these Plaintiffs was highly foreseeable to the Galveston-Houston Diocese and its officials. There were sufficient red flags prior to Patino's assignment to the parish of St. Francis de Sales to indicate that he could well pose a sexual risk to minor boys if he was given unsupervised access to them, which in fact he was.
>
> . . .
>
> In sum, the Diocese of Galveston-Houston should have been and was well aware that Patino posed a sexual risk to minor boys.

(*Id.*, Ex. 11 at ¶¶ 79–84, 87).

The defendants argue that these opinions are inadmissible expert testimony. The defendants object to the opinions that the information about Patino presented "red flags" and that Patino's future abuse of minors "was highly foreseeable to the Galveston-Houston diocese." (Docket Entry No. 102, Ex. 11 at ¶¶ 79–87). The defendants argue that whether it was reasonably foreseeable to the church officials that Patino would sexually abuse minors is not a topic appropriate for expert testimony. (Docket Entry No. 108 at 6–7). Citing to *Doe v. Boys Clubs of Greater Dallas*, 907 S.W.2d 472 (Tex. 1995), the defendants argue that the correct standard of foreseeability is whether a person of ordinary intelligence would have anticipated the harm. (Docket Entry No. 108 at 7). "Foreseeability . . . requires that a person of ordinary intelligence should have anticipated the danger created by a negligent act or

omission." *Boys Clubs*, 907 S.W.2d at 478.   The defendants cite to *United States v. Ragsdale*, 426 F.3d 765 (5th Cir. 2005), for the proposition that "a 'reasonable person' standard is a not a [sic] proper subject for expert testimony."  (Docket Entry No. 108 at 7). In that case, the court found that a juror could "draw on his own knowledge" to determine what relevant "community standards" were, making expert testimony unnecessary. 426 F.3d at 773.

The question is whether foreseeability in this context is appropriate for expert testimony.  Federal Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, evidence, training, or education may testify thereto in the form of an opinion or otherwise."  This "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). "The expert testimony must be relevant, not simply in the sense that all testimony must be relevant, Fed.R.Evid. 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591–92 (1993)).  For example, in *Brock v. Wal-Mart Stores Inc.*, 78 F.3d 582, 582 (5th Cir. 1996), the district court excluded expert testimony that "based on the absence of bumper blocks other than at the handicapped parking places and on the fact that the yellow paint used to mark the bumper block was the same as that marking the shopping cart corral,

lamp base, and the parking lot stripes, it was foreseeable that a preoccupied pedestrian would fail to notice the bumper block, trip and fall." The Fifth Circuit affirmed the district court's finding that the expert testimony "lack[ed] evidence of any scientific knowledge" and would not assist the jury in determining whether it was foreseeable that a pedestrian would "fail to notice the bumper block, trip and fall." *Id.*

Few courts have addressed the admissibility of expert testimony on the foreseeability that a particular individual is likely to commit sexual assault or abuse. Some courts have suggested that expert testimony as to whether sexual misconduct is a "well-known hazard" in a particular field, such as in the employment of police officers or teachers, is appropriate. *See Hudson v. City of Minneapolis*, No. Civ. 04-3313, 2006 WL 752935, at *5 (D.Minn. Mar. 23, 2006) ("[The plaintiff] failed to direct the Court to any expert testimony or affidavits demonstrating that sexual misconduct between a police officer and an alleged street-level criminal is a well-known hazard") (citing *P.L. v. Aubert*, 545 N.W.2d 666, 667–68 (Minn. 1996) (affirming summary judgment in favor of school district in the absence of expert testimony demonstrating that sexual relationships between teachers and students are a well-known hazard in the school environment); *Fahrendorff v. North Homes, Inc.*, 597 N.W.2d 905, 912 (Minn. 1999) (denying summary judgment in favor of a group home based partly on an expert's affidavit that sexual abuse is a well-known hazard in the field); *Marston v. Minneapolis Clinic of Psychiatry and Neurology, Ltd.*, 329 N.W.2d 306, 310–11 (Minn. 1982) (finding a fact issue on the question of employer liability for a psychologist's sexual misconduct with a patient, based partly on expert testimony that dual relationships between

42

a patient and a psychologist is a well-known hazard in the field)).  Courts have allowed such experts to testify on the general risk of sexual abuse based on specialized information about the nature of a job or profession and the vulnerabilities of those served by certain professionals.  These courts do not, however, allow an expert to opine as to whether it was reasonably foreseeable that a particular individual, who did not have a history of prior abuse of children, was likely to abuse children in the future.

In this case, the experts may not testify that it was reasonably foreseeable to the defendants, based on the available information, that Patino was likely to abuse children. These opinions do not rest on either medical or psychiatric expertise or on specialized knowledge about the Church.  Rather, such an opinion purports to assess whether reasonable people in the position of the Archdiocese Defendants should have recognized Patino as a likely child abuser, given the information available about him.  Whether the information about Patino made the risk of his sexual attacks reasonably foreseeable to the Archdiocese Defendants is a question committed by Texas law to the "reasonable person" standard.  The expert conclusions of Sipe and Doyle are neither relevant nor admissible on this point.  These witnesses may, however, testify as to whether the general risk of sexual misconduct by clergy—including seminarians training for the priesthood—toward parishioners' children was a hazard well known to Church officials charged with selecting and supervising such seminarians.

The objection to the experts' opinion and conclusion as to the foreseeability of Patino's misconduct is sustained.  The objection is overruled as to the opinions about the

extent to which the general risk of sexual misconduct of minor parishioners by seminarians training for the priesthood was a well-known hazard in the Church.[29]

The plaintiffs urge that there are fact issues as to whether the Archdiocese Defendants' selection of Patino as a pastoral intern and his assignment at St. Francis de Sales Parish Church was negligent, given the information available. The record shows that at a minimum, the Archdiocese Defendants knew that when they selected Patino and assigned him to the pastoral internship, he required close supervision primarily because he had

---

[29]   The defendants raise other objections to the plaintiffs' evidence as well. The defendants object to Exhibits 2, 3, 4, 5, and 22 to the plaintiffs' response to the summary judgment motion. The defendants argue that admitting these documents about church policies, beliefs, and practices. as summary judgment evidence "would violate the Religion Clauses" if they are used to "impose a civil legal duty on the Archdiocese Defendants," because "[r]eligious duties and policies do not translate into civil ones." (Docket Entry No. 108 at 1–3). These documents are not admitted as evidence of a legal duty or of a standard of care applicable to the Archdiocese Defendants. Rather, they are admitted for the limited purpose of showing the procedures and practices followed when Patino was admitted into the pastoral internship. The documents are frequently referred to in the deposition testimony discussing these practices and procedures. (Docket Entry No. 98, Ex. 20 at 20–21, 59–60, 149, 159–60, 165–71, 173–82; id., Ex. 21 at 25, 30–36, 182–90). The defendants' objection is overruled.

The defendants object to Exhibit 3, the Program of Priestly Formation, as hearsay. (Docket Entry No. 108 at 3). The plaintiffs respond that they are not offering this document for the truth of the matter asserted. (Docket Entry No. 114 at 2). This document was again discussed in the deposition testimony of Monsignor Rossi and Father Tiemann. (Docket Entry No. 98, Ex. 20 at 20–21, 59–60; id., Ex. 21 at 32–36). The defendants' objection is overruled; the document is admitted for a limited purpose.

The defendants object to Exhibit 4, the Religiosorum Institutio Instruction on the Careful Selection and Training of Candidates for the States of Perfection and Sacred Orders, as hearsay, out-of-date information, and lacking the necessary predicate. (Docket Entry No. 108 at 3–4). The plaintiffs respond that they are not offering this document for the truth of the matters asserted. (Docket Entry No. 114 at 2). The predicate for admitting this document for a limited purpose is sufficient. (Docket Entry No. 98, Ex. 20 at 165–72). The age of the document affects its weight but does not make it inadmissible for the limited purpose of showing the practices and procedures applicable to selecting seminarians. The defendants' objection is overruled.   Other Church-related documents that the defendants object to are irrelevant or otherwise inadmissible. The defendants object to Exhibit 12, A Report on the Crisis in the Catholic Church in the United States. (Docket Entry No. 108 at 8–9). This document was not written until after the events at issue in this case. The objection is sustained. The defendants also object to Exhibit 22, a number of excerpts from the *Dictionary of Moral Theology*. (Docket Entry No. 108 at 11). The plaintiffs note that this document is not offered for the truth of the matter asserted. (Docket Entry No. 114 at 8-9). The excerpts are not relevant to the hiring practices and procedures of the Galveston–Houston Diocese. The objection is sustained.

unresolved issues about his sexuality.  The record is unclear as to whether the Archdiocese

Defendants anticipated that as a normal part of his job duties, Patino would be holding one-

on-one meetings with parishioners' children.  In his deposition, Father Tiemann testified as

follows:

> Q: During the time that a seminarian is going through the
> formation or pastoral internship and under this close
> supervision, would he normally counsel parishioners?
> A: He would counsel in the sense of spiritual counseling anyone
> that would ask it.
> Q: Would he do so one-on-one behind closed doors, or with
> Father Pickard supervising him?
> A: I would say if requested by someone, if somebody asked him,
> you know, Juan Carlos, I would like to speak to you, there's
> something bothering me, yeah, he would respond and that would
> be normal.

(Docket Entry No. 98, Ex. 20 at 92).  Father Tiemann did not testify as to whether one-on-

one meetings with young boys, unaccompanied by parents or another adult, was an expected

feature of the pastoral internship for which Patino was selected.

In a letter to Bishop Fiorenza, Monsignor Pickard outlined the duties that Patino had

been performing, which Monsignor Pickard believed qualified Patino to be confirmed as a

deacon.  (Docket Entry No. 98, Ex. 8).  In that letter, Monsignor Pickard stated that Patino

"is very competent in liturgy, in conducting communion services at Church, in nursing

homes, and visiting the sick in their homes.  He has been involved in the Spanish language

Youth Retreats at the diocesan level, and has taught specific religion classes in two or three

parishes at their request.  I always hear very commendatory remarks about his ability.  He

has helped with several funerals and weddings, and has prepared several couples for

marriage.  He does well in all these ministries."  (*Id.*, Ex. 8 at DIO0114–15).  Monsignor Pickard did not mention private counseling of young boys.  Monsignor Rossi testified that Monsignor Pickard told him that he was not aware of any boy other than Doe I that Patino had close contact with, suggesting that Monsignor Pickard had no knowledge that Patino was arranging private meetings with other boys.  (*Id.*, Ex. 21 at 131).  However, Doe IV's mother testified that Monsignor Pickard told her that Patino was available for private "counseling" with boys, including Doe IV.  (*Id.*, Ex. 18 at 51–55).  There is no indication in the record as to whether Monsignor Rossi or Father Tiemann told Monsignor Pickard that Patino needed to be closely supervised.

The evidence shows that the Archdiocese Defendants were aware that Patino required close supervision primarily because of a history of unresolved sexual issues.  The evidence raises fact issues as to whether the defendants properly assigned and supervised Patino, given the information available about him.  When the decision was first made to accept Patino into the program, the defendants were on notice that they would need to exert close supervision over Patino because of his unresolved sexual issues.  The Archdiocese Defendants testified that they believed Patino was adequately supervised because he lived in the rectory with Monsignor Pickard.  But it is unclear what information was provided to Monsignor Pickard about Patino or whether he was told of a need to supervise him closely.  It is also unclear that Monsignor Pickard exercised any meaningful supervision over Patino's conduct and behavior.

46

Over time, more information became available showing that Patino was using his role as a seminarian and pastoral intern to obtain unsupervised access to young boys. Evidence in the record shows that Patino was using his position to pursue opportunities for private meetings with young boys in his own living quarters. The mothers of the four abused boys testified that Patino repeatedly insisted that they allow their sons to have private "counseling" sessions with him. Patino brought the young boys, unaccompanied, to his living quarters at the rectory. The boys testified that Patino told them that he had abused a number of other boys in the church. Monsignor Rossi and Father Tiemann stated that they did not know that Patino was having private, unsupervised meetings with young boys in his living quarters. Monsignor Pickard's statement to Monsignor Rossi, that he had no knowledge of any boy other than Doe I with whom Patino had close contact, suggests that Monsignor Pickard had no knowledge that Patino was bringing young boys into the rectory or arranging with their mothers to send the boys to have private meetings with Patino. Doe IV's mother's testimony suggests that Monsignor Pickard did know that Patino was privately meeting with the boys. In either event, there is no evidence of the careful supervision that the Archdiocese Defendants knew would be necessary if Patino was allowed to serve as a seminarian and pastoral intern.

If the defendants did anticipate that Patino's internship would include unsupervised one-on-one meetings with young boys, given the warnings by Dr. Lester and Father Tiemann, there is a fact issue as to whether it was appropriate to accept Patino for the internship or assign him to such duties, with no apparent effort to monitor this aspect of his

work.  If the defendants did not anticipate that Patino's routine duties would include such meetings, Patino's dogged pursuit of opportunities for one-on-one meetings with young boys and the evidence that Patino repeatedly brought young boys to his living quarters in the rectory create disputed fact issues as to whether the defendants should have foreseen that Patino was a risk to these boys and failed to take reasonable steps to assign or supervise him to prevent it.  *See G.B. v. Archdiocese of Porland*, No. Civ. 01-1437-AS, 2002 WL 31441220, at *6 (D. Or. April 18, 2002) ("[A]n employer who has knowledge of an employee's predilection to sexually abuse young boys unreasonably creates a foreseeable risk by allowing the employee uninhibited access to young boys."); *Washington v. Resolution Trust Corp.*, 68 F.3d 935, 937 (5th Cir. 1995) ("While the existence of a duty is a question of law for the court to decide, if foreseeability requires resolution of disputed facts or inferences, these questions are inappropriate for legal resolution.").

### b.    Cause-in-Fact

The record also discloses disputed fact issues as to whether the Archdiocese Defendants' failure to assign or supervise Patino adequately was a cause-in-fact of the abuse he committed.  In *Robertson v. Church of God, Int'l*, 978 S.W.2d 120 (Tex. App.—Tyler, 1997, no writ), a woman sued a church because its minister assaulted her.  The woman was not a member of the church.  She was a massage therapist whom the minister sought out for therapy because of the many hours he spent driving in his car.  The court found that the church's allegedly negligent hiring was not the cause-in-fact of the assault.  *Id.* at 125.  In *Boys Clubs of Dallas*, a volunteer for a children's organization had prior convictions for

48

driving while intoxicated and later allegedly sexually abused minors in activities unrelated to the organization.  907 S.W.2d 472.  The court found that the plaintiffs' relationship with the volunteer had developed "independently of the Boys Club's relationship with the [plaintiffs]."  *Id.* at 481.  The court found that the volunteer's position was a "preliminary condition in the course of events which made possible his assaults on [the plaintiffs].  Lastly, since there is no evidence that [the volunteer] molested or assaulted any boys at the club's premises, there is no evidence the Boys Club's alleged failure to supervise was a producing cause of the injuries."  *Id.* at 478.

In this case, unlike the facts in *Robertson*, the evidence shows that Patino used his position as a seminarian to obtain unfettered and unsupervised access to young boys.  Unlike the facts in *Boys Clubs*, the record in this case shows that Patino's contact with the children did not develop independently of the church, but rather through Patino's position at the church.  The abuse occurred on the church premises.  The evidence raises a question of fact as to whether the defendants' allegedly negligent assignment and supervision was the cause-in-fact of the plaintiffs' injury.

The defendants' motion for summary judgment is denied as to the plaintiffs' claim for negligent hiring/assignment and supervision.

## IV.  The Claims Under the Sexual Exploitation by Mental Health Services Provider Act

The plaintiffs allege that Patino violated the Texas Sexual Exploitation by a Mental Health Provider Act.  TEX. CIV. PRAC. & REM. CODE § 81.001 *et seq.*  (Docket Entry No. 95

at ¶¶ 4.01–07).  The plaintiffs allege that the Archdiocese and Bishop Fiorenza are liable as
Patino's employer under the Act and for failing to report Patino's abuse, as required by the
Act.  (*Id*. at ¶¶ 7.01–03).  The defendants move for summary judgment as to this claim on the
grounds that Patino was not a mental health services provider as defined under the Act; that
the services he did provide are excepted from the Act; that the Act does not apply to the
Archdiocese Defendants as an employer; and that these defendants did not violate the Act.
(Docket Entry No. 98 at 12–19).[30]

The Act defines a "mental health services provider" as:

> [A]n individual, licensed or unlicensed, who performs or
> purports to perform mental health services, including a:
>> (A) licensed social worker as defined by Section
>> 505.002, Occupations Code;
>> (B) chemical dependency counselor as defined by
>> Section 504.001, Occupations Code;
>> (C) licensed professional counselor as defined by Section
>> 503.002, Occupations Code;
>> (D) licensed marriage and family therapist as defined by
>> Section 502.002, Occupations Code;
>> (E) member of the clergy;
>> (F) physician who is practicing medicine as defined by
>> Section 151.002, Occupations Code;
>> (G) psychologist offering psychological services as
>> defined by Section 501.003, Occupations Code; or
>> (H) special officer for mental health assignment certified
>> under Section 1701.404, Occupations Code.

---

[30] The plaintiffs argue that Exhibit 6 to the defendants' summary judgment motion, a bill analysis
of S.B. 210, is not authenticated and is hearsay.  (Docket Entry No. 103 at 2).  The defendants later submitted
an affidavit to establish the predicate for this exhibit.  (Docket Entry No. 109, Ex. 24).  In addition, a bill
analysis is part of legislative history and can be the subject of judicial notice.  *See Territory of Alaska v. Am.
Can Co.*, 358 U.S. 224, 226–27 (1959); *accord Int'l Truck and Engine Corp. v. Bray*, 372 F.3d 717, 728 at
n.13 (5th Cir. 2004).  The plaintiffs' objection to Exhibit 6 is overruled.

TEX. CIV. PRACTICE & REMEDIES CODE § 81.001(2).  The defendants argue that Patino was not a member of the clergy because he was "not yet a deacon . . . [and] was only a seminarian," was not a licensed professional counselor; and was not performing or purporting to perform mental health services.  (Docket Entry No. 98 at 13–14).

Although the Texas Civil Practice & Remedies Code refers to the Texas Occupations Code for the definitions of licensed mental health providers, the statute does not define "member of the clergy."  TEX. CIV. PRACTICE & REMEDIES CODE § 81.001(2).  The Act is clear that a mental health services provider does not have to be an ordained member of the clergy.  Nor does the Act require that a mental health services provider be licensed to provide counseling or similar services.  The question is whether there are disputed fact issues material to determining whether Patino performed or purported to perform "mental health services" as defined by the Act.

The Act defines "mental health services" as follows:

> (1) "Mental health services" means assessment, diagnosis, treatment, or counseling in a professional relationship to assist an individual or group in:
>> (A) alleviating mental or emotional illness, symptoms, conditions, or disorders, including alcohol or drug addiction;
>> (B) understanding conscious or subconscious motivations;
>> (C) resolving emotional, attitudinal, or relationship conflicts; or
>> (D) modifying feelings, attitudes, or behaviors that interfere with effective emotional, social, or intellectual functioning.

Tex. Civ. Practice & Remedies Code § 81.001(1).  The definition is subject to an exception.  "'Mental health services,' as defined by this section, provided by a member of the clergy does not include religious, moral, and spiritual counseling, teaching, and instruction."  *Id.* at § 81.001(7).

The evidence in this case shows that, whether or not a seminarian and pastoral intern is a member of the clergy for the purpose of the Act, Patino was neither performing nor purporting to perform "mental health services" in a professional counseling relationship with the children he abused.  The evidence also shows that the counseling Patino was purporting to perform was religious, moral, and spiritual advice and instruction, excluded from the Act.

It is undisputed that Patino was not providing professional counseling.  As Bishop Fiorenza testified, Patino was "not a counselor.  He was just a—well, he was a student preparing for priesthood.  I don't think he had any—he may have had a course in [counseling] during his college years, but that would have been—he was not a counselor.  He was a seminarian." (Docket Entry No. 98, Ex. 22 at 74).  Patino's duties were "assisting during mass; conducting communion services at Church, in nursing homes and visiting the sick, teaching religion classes, helping with funerals and weddings, preparing couples for marriage, and participating in Youth Retreats." (Docket Entry No. 98 at 16–17).  In a letter to Bishop Fiorenza, Monsignor Pickard outlined the duties that Patino had been performing as a pastoral intern.  (Docket Entry No. 98, Ex. 8).  In that letter, Monsignor Pickard did not mention counseling.  Father Tiemann testified that as a seminarian going through the

formation or pastoral internship, the only counseling Patino would perform would be religious or spiritual counseling.  (Docket Entry No. 98, Ex. 20 at 92).

The plaintiffs argue that even if Patino was not performing professional counseling, the evidence raises a fact issue as to whether he was purporting to do so and whether the Archdiocese Defendants were aware of it.  The plaintiffs argue that Patino and/or Monsignor Pickard presented Patino as someone who could perform professional counseling.  The evidence shows, however, that at most, Patino offered to provide religious and spiritual counseling to the children and Monsignor Pickard told parishioners that Patino had experience working with youth and could provide guidance on issues facing teenagers.

The plaintiffs point to evidence in the record that Monsignor Pickard described Patino as someone who could work with young people.  Doe I's mother testified that Monsignor Pickard introduced Patino as the "new priest" who would be "working with the youth group." (Docket Entry No. 98, Ex. 11 at 77).  The mother of Does II and III testified that Monsignor Pickard introduced Patino as "the new priest and that anybody who wanted to get close to him and talk to him could do it, that he was going to serve the Hispanic community."  (*Id.*, Ex. 14 at 42).  Doe IV's mother testified that Monsignor Pickard told her that "in the case of us mothers, if we were having any type of problems—for instance, if we knew of any gang involvement, problems with drugs, sex, behavioral problems—that [Patino] was a person who was very open and that we could do to him for advice. . . .When [Monsignor Pickard] introduced [Patino] at the mass, when he introduced him, he said that he could be quite a help to us mothers of adolescent children, that he could give us some advice, that he was a person

who was prepared as a counselor." (*Id.*, Ex. 18 at 51–52).  Doe IV's mother testified that Monsignor Pickard represented to her that "[Patino] was a man who was well prepared to counsel and help in any type of counseling matter." (*Id.*, Ex. 18 at 53).  The mothers, however, all testified that they did not send their sons to Patino to receive professional counseling, but rather talk to a religious person about topics that ranged from soccer to getting along with siblings to avoiding profanity to resisting peer pressure.  (Docket Entry No. 98, Ex. 11 at 98; *id.*, Ex. 14 at 50, 57; *id.*, Ex. 18 at 56).  Doe IV testified that the only counseling his mother told him Patino would provide was spiritual counseling and advice, not professional counseling.  (*Id.*, Ex. 19 at 95–96).  The evidence shows that neither the plaintiffs nor their mothers expected Patino to provide professional counseling services, but only spiritual advice and religious guidance.  The testimony shows that none of the boys' mothers believed that their sons needed professional counseling and they did not send their boys to Patino to receive such professional counseling.  (*Id.*, Ex. 11 at 95–96; *id.*, Ex. 14 at 19–20, 57; *id.*, Ex. 18 at 54–55).  The mothers testified that they wanted their boys to spend time with a religious figure who could be a good role model.  (*Id.*, Ex. 14 at 50, 57; *id.*, Ex. 18 at 56).  The record shows that Patino lured the boys to the one-on-one meetings by telling their mothers that he could provide religious, moral, and spiritual counseling.  Although Patino apparently showed the boys he abused certificates purporting to show training in counseling, this does not support an inference that he was in a professional counseling relationship with the children.

The facts in this case are far different from those involved in *Hawkins v. Trinity Baptist Church*, 30 S.W.3d 446 (Tex. App.–Tyler 2000, no writ), in which the then-pastor of a church invited his secretary, also a church member, to his home for the ostensible purpose of giving her marital counseling.  At that meeting and at a later time, the pastor allegedly sexually abused her.  *Id.* at 448–49.  The plaintiff alleged that the church was liable under the Act.  The defendant church argued that the counseling was religious in nature and excluded from the Act's coverage.  The court noted that the Act covered counseling by a "member of the clergy" for "relationship conflict" and found no evidence that the marital counseling was "religious, moral and spiritual counseling, teaching and instruction."  *Id.* at 451.  In this case, by contrast, the Archdiocese Defendants have submitted extensive evidence showing that Patino did not provide counseling in a professional counseling relationship with the boys and that the only "counseling" he purported to offer was spiritual, moral, and religious instruction.

Because the evidence in the record shows that the "counseling" Patino purported to offer was religious, moral, and spiritual instruction and was not performed in a professional counseling relationship, as a matter of law, the services Patino purported to offer were not "mental health services" and Patino was not a "mental health services provider."

The record evidence also shows that the Act does not apply to the Archdiocese Defendants.  Under the Act, employers of a mental health services provider can be liable for hiring the provider as an employee and for failing to report or take necessary action if that employee commits sexual abuse.  The Act provides:

55

a) An employer of a mental health services provider is liable to a patient or former patient of the mental health services provider for damages if the patient or former patient is injured as described by Section 81.002 and the employer:

(1) fails to make inquiries of an employer or former employer, whose name and address have been disclosed to the employer and who employed the mental health services provider as a mental health services provider within the five years before the date of disclosure, concerning the possible occurrence of sexual exploitation by the mental health services provider of patients or former patients of the mental health services provider; or

(2) knows or has reason to know that the mental health services provider engaged in the sexual exploitation of the patient or former patient and the employer failed to:

(A) report the suspected sexual exploitation as required by Section 81.006; or
(B) take necessary action to prevent or stop the sexual exploitation by the mental health services provider.

. . .

(c) An employer or former employer is liable under this section only to the extent that the failure to take the action described by Subsection (a) or (b) was a proximate and actual cause of damages sustained.

TEX. CIV. PRACTICE. & REM. CODE § 81.003.

The Archdiocese Defendants argue that they are not liable under the Act because the Archdiocese was not "an employer of a mental health services provider" under section 81.003.  (Docket Entry No. 98 at 16–19).  The evidence shows that while there is some uncertainty as to the precise duties Patino would perform, the Archdiocese Defendants did

not anticipate that he would provide professional counseling services and did not accept him as a pastoral intern for that purpose.  The undisputed facts show that the Archdiocese did not employ Patino to provide mental health services and did not reasonably anticipate that he would be providing such services.

Again, *Hawkins v. Trinity Baptist Church*, 30 S.W.3d 446 (Tex. App.—Tyler, July 7, 2000, no writ), is instructive.  In that case, the court evaluated whether a church whose pastor sexually abused a church member was liable under the Act.  The issue was whether the church had hired the pastor "to provide mental health services, or if it had employed him for the purpose of 'religious, moral and spiritual counseling, teaching and instruction.'"  *Id.* at 454.  The plaintiff testified that the church "had a policy of referring couples needing marital counseling to [] a licensed professional counselor. The church paid one-third of [the licensed counselor's] fee while the referred couple would pay the remaining two-thirds."  *Id.* The chairman of the church's board of deacons testified that the church "only authorized its pastor and staff members to provide counseling, teaching and instruction that was religious, moral and spiritual" and that the church "had never advertised that it provided mental health counseling services, and that no one had informed the board of deacons that anything other than religious, moral or spiritual training was being provided by [the church]."  *Id.*  The court noted that neither plaintiff had provided evidence that the church had hired the pastor "in a capacity to provide counseling, instruction or teaching other than religious, moral and spiritual."  *Id.*  The court concluded that there was no evidence to show that the congregation "knew or had reason to know that [the pastor] was giving [the plaintiffs] any counseling,

teaching or instruction other than religious, moral and spiritual." *Id.* Based on that evidence, the court found "[t]here is no evidence in the record to show [the church] hired [the pastor] for any purpose other than to provide religious, moral and spiritual counseling, teaching and instruction to its members. Thus, no duty to inquire of [the pastor's] past sexual exploitation arose under section 81.003 of the Act." *Id.* Similarly, in *Doe v. South Central Spanish Dist. of Church of God*, No. 05-01-01850-CV, 2002 WL 31296620 (Tex. App.—Dallas, Oct. 14, 2002, no pet.), the court considered whether a pastor accused of sexual exploitation while providing abortion counseling was hired for the purpose of providing mental health services. The church's district overseer testified that "the district never authorized any counseling by [the pastor] other than to provide religious, moral, or spiritual counseling and had no knowledge he was allegedly providing any counseling other than religious, moral, or spiritual until it received a copy of the petition in this suit." *Id.* at *3. A member of the church's Board of Elders testified that "at no time since he was a member had the church authorized the pastor to provide any counseling, teaching, and instruction other than religious, moral, and spiritual." *Id.* Based on that evidence, the court found that the church was not liable under section 81.003. *Id.*

In the present case, the evidence does not raise a fact issue as to whether the Archdiocese Defendants expected or reasonably should have expected Patino to provide any counseling other than religious, moral, or spiritual advice or instruction. There is no evidence that the Archdiocese Defendants accepted Patino as a seminarian and assigned him to the pastoral internship to provide any counseling other than religious, moral, or spiritual

58

advice or instruction.  Taking the facts in the light most favorable to the plaintiffs, the evidence shows that at most, Monsignor Pickard presented Pickard as someone whose duties could include providing religious counseling to young members of the church and offering advice about issues teenagers might face.  The record does not raise a fact issue as to whether Patino was providing or was expected to provide mental health services.  As a matter of law, the Archdiocese Defendants are not liable as an employer under section 81.0003 of the Act. As a result, they cannot be liable under sections 81.003(a)(1) and 81.003(a)(2) of the Act.

The defendants' motion for summary judgment is granted as to claims under the Sexual Exploitation by Mental Health Services Provider Act, Texas Civil Practice & Remedies Code § 81.001, *et seq.*

## V.    The Claim that the Defendants Breached a Common-Law Duty to Report Child Abuse

The plaintiffs alleged that the Archdiocese Defendants breached a common-law duty to report Patino to law enforcement after Doe I accused Patino of sexual abuse.  There are disputed fact issues as to whether the Archdiocese Defendants did report the abuse to law enforcement.  The defendants move for summary judgment on the basis that even with these fact issues, there is no common-law duty to report child abuse under Texas law that provides a basis for recovery.  (Docket Entry No. 98 at 20).  The defendants cite *Perry v. S.N*, 973 S.W.2d 301 (Tex. 1998).  In that case, the Texas Supreme Court did not decide "whether Texas should impose a common law duty to report or prevent child abuse." *Id.* at 309.  The

plaintiffs argue that neither *Perry* nor other Texas cases establish that, as a matter of law, there is a common-law duty to report child abuse.  (Docket Entry No. 102 at 29).

Texas courts have not directly addressed this issue.  In formulating an *Erie* guess as to how the Texas Supreme Court would decide an unresolved state-law issue, the Fifth Circuit makes its forecast based on (1) decisions of the Texas Supreme Court in analogous cases, (2) the rationales and analyses underlying Texas Supreme Court decisions on related issues, (3) dicta by the Texas Supreme Court, (4) lower state court decisions, (5) the general rule on the question, (6) the rulings of courts of other states to which Texas courts look when formulating substantive law, and (7) other available sources, such as treatises and legal commentaries.  *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 199 (5th Cir. 2006).  These factors are examined separately below.

### A.     Decisions of the Texas Supreme Court in Analogous Cases

The Texas Supreme Court considers "legislative enactments that evidence the adoption of a particular public policy significant in determining whether to recognize a new common-law duty."  *Thapar v. Zezulka*, 994 S.W.2d 635, 639 (Tex. 1999).  The Texas Family Code requires a "person having cause to believe that a child's physical or mental health or welfare has been or may be adversely affected by abuse or neglect by any person" to "immediately make a report" to the proper authorities.  TEX. FAM. CODE § 261.101(a).  The statute makes it a misdemeanor offense to fail to report abuse or neglect.  The Texas Supreme Court has found that this provision reflects "a strong policy to protect children from abuse."  *Golden Spread Council v. Akins*, 926 S.W.2d 287, 291 (Tex. 1996).  In *Golden*

60

*Spread*, the court found that under this public policy, a local council of the Boy Scouts of America owed a duty not to recommend a candidate to a church seeking a scoutmaster "if [the council] knew or should have known that [the candidate] was peculiarly likely to molest boys." *Id.* at 292. However, in *Perry*, the Texas Supreme Court refused to find negligence *per se* based on a violation of Section 261.101(a). *Perry* reversed the appellate court's finding that this statute created a tort duty and a basis for civil liability as well as a duty to obey a criminal-law provision that could be punished if violated. Because the issue was not presented, however, the *Perry* court declined to consider whether Texas should impose a common-law duty to report child abuse. The court did acknowledge that such a duty would be a new one under Texas law. 973 S.W.2d at 203. The *Perry* court's refusal to find a statutory duty based on Section 261.101(a) suggests that it would be similarly reluctant to create a common-law duty to report child abuse based on the public policy concerns reflected in that provision. The public-policy analysis in *Golden Spread* is less probative of how the court would approach a common-law duty to report child abuse because *Golden Spread* involved an employment recommendation, not a report of a known instance of abuse. Given that the Texas Supreme Court found a violation of Section 261.109(a) to be an inappropriate basis for tort liability, it is this court's *Erie* guess that the Texas Supreme Court would similarly find Section 261.109(a) to provide inadequate support for a common-law duty to report child abuse. This factor weighs against finding such a duty.

   **B.     The Rationales and Analyses Underlying Texas Supreme Court Decisions
            on Related Issues**

In refusing to recognize a right to recovery in tort for violation of a criminal child abuse reporting statute, the Texas Supreme Court in *Perry* considered a number of factors, including:

> (1) whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common law duty; (2) whether the statute puts the public on notice by clearly defining the required conduct; (3) whether the statute would impose liability without fault; (4) whether negligence per se would result in ruinous damages disproportionate to the seriousness of the statutory violation, particularly if the liability would fall on a broad or wide range of collateral wrongdoers; and (5) whether the plaintiff's injury is a direct or indirect result of the violation of the statute.

*Perry*, 973 S.W.2d at 309. The court's examination of these factors informs the analysis of whether the court would recognize a common-law duty to report child abuse. The court expressed concern that if it created a duty to report child abuse whenever a person "has cause to believe" abuse "may be" present, a person who "become[s] aware of a possible case of child abuse only through second-hand reports or ambiguous physical symptoms" would have a duty "to report on . . . difficult judgment calls" in "unclear" circumstances. *Id.* at 307. That person, moreover, would be subject to "ruinous liability disproportionate to the seriousness of . . . conduct." *Id.* at 308. The court also found that "the indirect relationship between violation" of the duty "and the plaintiff's ultimate injury is a factor against imposing tort liability." *Id.* at 309. Because a duty to report "interposes not one but two independent actors" between the victim and the abuser—the defendant reporter of the abuse and the state

agency to which the defendant is required to report—"the connection between the defendant's conduct and the plaintiff's injury is significantly more attenuated." *Id.*

In summary, the court was troubled by the prospect that "a decision to impose negligence *per se* could not be limited to cases charging serious misconduct like the one at bar, but rather would impose immense potential liability under an ill-defined standard on a broad class of individuals whore relationship to the abuse was extremely indirect." *Id.* These concerns apply with equal force to a common-law duty to report abuse and weigh against a finding that the Texas Supreme Court would create such a duty.

### C.    Dicta by the Texas Supreme Court

Because the Texas Supreme Court has not addressed whether to create a common-law duty to report child abuse and expressly declined to consider the issue in *Perry*, 973 S.W.2d at 309, this factor is neutral as to whether the court would create or recognize such a duty.

### D.    Lower State Court Decisions

Lower courts in Texas have declined to recognize a common-law duty to report child abuse. *See, e.g.*, *Nash v. Perry*, 944 S.W.2d 728 (Tex.App.–Austin 1997, no writ), *rev'ed in part by Perry v. S.N.*, 973 S.W.2d 301 (Tex. 1998) (finding no common-law duty to report abuse in part because "[w]e find in the petition no allegation that would take the case out of the general rule that a bystander owes no legal duty, under the common law, to warn of a danger or to assist in preventing injury to another").  This factor weighs against finding a common-law duty to report child abuse.

### E.    The General Rule on the Question

The Texas Supreme Court has acknowledged that "[a]t common law there is generally no duty to protect another from the criminal acts of a third party or to come to the aid of another in distress." *Perry*, 973 S.W.2d at 306. "Generally, failing to report a crime, like any other failure to act, is not a crime unless a specific law provides that the omission is an offense or otherwise provides that [one] has a duty to perform the act." *Ed Rachal Found. v. D'Unger*, 207 S.W.3d 330, 332 (Tex. 2006) (citations omitted). As the court held in Perry, Texas's statutory reporting duty cannot serve as a basis for imposing civil tort liability on an individual who fails to report child abuse. *Perry*, 973 S.W.2d at 309. This factor weighs against finding a common-law duty to report child abuse.

### F.  The Rulings of Courts of Other States to Which Texas Courts Look

Only a handful of state courts have addressed the issue of there is a common-law duty to report child abuse. No court has found such a duty. *See, e.g.*, *Varela ex rel. Nelson v. St. Elizabeth's Hosp. of Chicago, Inc.*, 867 N.E.2d 1, 8–13 (Ill.App. 1 Dist., 2006) (finding that "[i]t would be illogical to argue that although the Illinois legislature has not expressly or impliedly created a private right of action for violation of the Reporting Act, individuals may nevertheless assert a private right of action for violation of the Reporting Act, so long as those individuals allege they are proceeding at common law rather than on a statutory basis," and holding that because "there is no duty under the Illinois common law of torts . . . to rescue others from being injured by third parties," "[w]e have no basis or authority to create common law liability" for a failure to report abuse) (citations omitted); *Heidt v. Rome Mem'l Hosp.*, 278 A.D.2d 786, 787 (N.Y.A.D. 4 Dept. 2000) (finding no duty at common law to

report suspected child abuse); *David M. v. Erie County Dept. of Human Services*, No. E-93-40, 1994 WL 319053, at *3 (Ohio App. 6 Dist., June 30, 1994) (finding that the defendant "owed no common law duty to [the plaintiff] to protect him from further child abuse"); *J.A.W. v. Roberts*, 627 N.E.2d 802, 813 (Ind.App. 1994), *abrogated by Holt v. Quality Motor Sales, Inc.*, 776 N.E.2d 361 (Ind.App. 2002) (finding that the defendants "did not owe [the plaintiff] a common law duty to report to the authorities allegations of sexual abuse"); *Marcelletti v. Bathani*, 500 N.W.2d 124, 130 (finding no common-law duty to protect a victim of child abuse); *Cechman v. Travis*, 414 S.E.2d 282, 285 (Ga.App. 1991) (finding that under common-law medical negligence, a physician "breached no legal duty, even to the state, by failing to discover and report a case of possible child abuse").

Some courts have suggested that a common-law duty to report child abuse may exist in the presence of a special relationship between the child victim and the reporting party. *See, e.g.*, *Draper v. Westerfield*, 181 S.W.3d 283, 292 (Tenn.2005) (finding that "[b]y reviewing [the victim's] records as part of a child abuse investigation, [the defendant physician] voluntarily undertook a duty on behalf of [the victim] to use reasonable care in reviewing the medical records and reporting his findings and conclusions to the investigators," so that "[i]f [the defendant] is found not to have reported harm and is therefore not immune from liability, [the plaintiff's] common law negligence action may proceed"); *but see Kimberly S.M. v. Bradford Cent. Sch.*, 226 A.D.2d 85, 88 (N.Y.A.D. 1996) (affirming the lower court's decision that, "[a]lthough a school district has a special relationship with its students," when the reported acts of sexual abuse occurred "well beyond the supervisory

65

responsibility of a school" a "teacher owed no common-law duty to report the suspected case of child sexual abuse to anyone").   No court has found such a special relationship in a church–parishioner context.   *See, e.g.*, *Berry v. Watchtower Bible and Tract Soc. of New York, Inc.*, 879 A.2d 1124, 1129–30 (N.H. 2005) (finding no special relationship between the plaintiffs and the defendant church and congregation, in part because "[t]he creation of an amorphous common law duty on the part of a church or other voluntary organization requiring it to protect its members from each other would give rise to both unlimited liability and liability out of all proportion to culpability," and holding that "there is no common law duty running from [defendant church and congregation] to the plaintiffs"); *Meyer v. Lindala*, 675 N.W.2d 635, 640 (Minn.App. 2004) (finding no special relationship between the victim and a Jehovah's Witnesses congregation giving rise to a duty on the part of the congregation to report, in part because [p]roviding faith-based advice or instruction, without more, does not create a special relationship").

This factor weighs against finding that Texas would recognize a common-law duty to report child abuse.

### G.    Treatises and Legal Commentaries

Treatises and legal commentaries examining a duty to report child abuse address the issue in the context of state reporting statutes.   *See, e.g.*, 43 C.J.S. *Infants* § 117 (2007) ("There is authority that a failure to comply with a statute imposing a duty on specified persons, institutions, or agencies to report known or suspected child abuse may give rise to a private cause of action against that person, institution, or agency failing to do so . . . ."); 6

66

AM. JUR 2D *Proof of Facts* 345, § 4 (2007) ("The theory of liability most often advanced is based on violation of the child abuse reporting statute.").  Some treatises and commentaries also address the issue in the context of common-law medical negligence.  *Id.*, § 4 ("A second theory of civil liability is based on common-law medical negligence.  This theory is premised on the basic duty of a physician to possess and use reasonable skill and care in the treatment of patients and the diagnosis of their ailments. . . . [T]he common-law malpractice theory is essentially based on the physician's failure to properly diagnose a child as physically abused."); 38 AM. JUR. *Trials* 1, § 9 (2007) ("Doctors and hospitals, along with teachers and social workers, are regarded as the first line of defense in the war against child abuse because they are the most likely to come in contact with maltreated children when symptoms of abuse, neglect, or molestation are most apparent.").  Because texts summarizing the state of the law do not document a common-law duty to report child abuse, this factor is neutral or weighs against finding such a duty.

In summary, the factors weigh against finding a state common-law duty to report child abuse in this case.  Neither Texas law nor the sources of law to which Texas courts look supports the creation or recognition of such a duty.  This court declines to impose a common-law duty that Texas courts have not imposed.

The defendants' motion for summary judgment as to the common-law duty to report claim is granted.

## VI.    The Defective Premises Claim

A premises owner must use reasonable care to protect or warn invitees against an "unreasonably dangerous condition" of which it has actual or constructive notice. *Brookshire Grocery Co. v. Taylor*, No. 03-0408, 2006 WL 3456559, at *1 (Tex. Dec. 1, 2006); *Corbin v. Safeway Stores, Inc*., 648 S.W.2d 292, 295 (Tex. 1983). The plaintiffs allege that Patino's reasonably foreseeable predilection to sexually abuse minors made the premises of St. Francis unreasonably dangerous and makes the Archdiocese Defendants are liable for failing to protect or warn parishioners of the danger. (Docket Entry No. 95 at ¶ 10.01–03). The plaintiffs allege that the defendants "were aware or should have been aware of criminal acts of assault by [Patino] to Plaintiffs on the property." (*Id*. at ¶ 10.02). The defendants argue that the premises were not defective because the harm was not foreseeable. (Docket Entry No. 98 at 23). This court has already found that the plaintiffs have raised a fact question as to whether the harm to the plaintiffs was foreseeable when Patino was assigned to the internship and during the time that he was at St. Francis. Citing to no case law, the plaintiffs argue that because there are fact issues as to foreseeability, the defendants "have not met their burden of conclusively negating this element of Plaintiffs' premises liability claim." (Docket Entry No. 102 at 32).

A premises liability claim is usually asserted when a plaintiff seeks to hold a premises owner liable for a third party's actions. Generally, a premises owner has no legal duty to protect or warn against a third party's criminal acts. A premises owner can be liable, despite this lack of duty, if the owner knows or has reason to know of the likelihood of such criminal acts and fails to take reasonable steps to protect or warn against the harm. *See Timberwalk*

*Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex. 1998) (citing RESTATEMENT

(SECOND) OF TORTS § 344 (1965)).

The RESTATEMENT (SECOND) OF TORTS cited by the Texas Supreme Court in

*Timberland* states:

> A possessor of land who holds it open to the public for entry for
> his business purposes is subject to liability to members of the
> public while they are upon the land for such a purpose, for
> physical harm caused by the accidental, negligent, or
> intentionally harmful acts of third persons or animals, and by the
> failure of the possessor to exercise reasonable care to
>> (a) discover that such acts are being done or are likely to be
>> done, or
>> (b) give a warning adequate to enable the visitors to avoid the
>> harm, or otherwise to protect them against it.

RESTATEMENT (SECOND) OF TORTS § 344 (1965).

In *Timberwalk Apartments*, a woman who rented an apartment was raped at the

apartment complex.  She sued her landlord based on premises liability.  Although there had

been a number of crimes committed in and near the apartment complex during the  previous

year, including a sexual assault, the crimes had not been reported in the media.  Because the

landlord neither knew nor reasonably should have known of the likelihood of criminal

assault, the court dismissed the premises liability claim.  972 S.W.2d at 759.  Similarly, in

*Urena v. Western Investments, Inc.*, 162 S.W.3d 547 (Tex. 2005), the Texas Supreme Court

reversed an appellate court decision holding a landlord liable after a tenant's minor son was

sexually assaulted by another tenant.  The appellate court had held that because there had

been "a series of violent crimes such as attempted sexual assault, rubbery, and murder" in

and around the apartment complex, the risk of other violent crimes, including rape, was foreseeable. *Id.* at 549. The Texas Supreme Court reversed, holding that the evidence did not support a showing of either foreseeability or a causal link between the landlord's omissions and the assault. *Id.* at 552. The tenant who committed the assault was authorized to be on the property. Knowledge of crimes in the area would not have alerted the landowner to the risk posed by that tenant. *Id.* at 551–52.

The plaintiffs cite no cases in which a courts has analyzed the application of a premises liability cause of action when the premises owner already has a duty to protect an invitee against harm from a tortfeasor because that tortfeasor is the invitee's employee, agent, or in a similar relationship. The plaintiffs in this case were not injured by criminal or tortious acts by a third party, but rather by an employee or agent of the Archdiocese Defendants. The record shows no "criminal acts of third parties," an element of the RESTATEMENT section adopted by the Texas Supreme Court in *Timberland* and other cases. The Archdiocese Defendants did not, however, raise this argument. Because this court has found disputed fact issues material to determining whether the risk of Patino's abuse was foreseeable, summary judgment on this claim is denied.

## VII.   Other Pending Motions

### A.   The Plaintiffs' Motion to Compel

The plaintiffs moved to compel answers to questions that were objected to during the depositions of Bishop Fiorenza, Monsignor Rossi, and Father Tiemann. (Docket Entry No. 101). The defendants have responded. (Docket Entry No. 106). Most of the questions

related to sexual misconduct allegations against other priests, deacons, or seminarians, unrelated to Patino.  In April 2006, after a hearing, this court required the Archdiocese Defendants to produce information requested in discovery relating to allegations of sexual misconduct involving minors by a priest, deacon, or seminarian in the Archdiocese between 1992 to 1998.  (Docket Entry No. 73).  After another hearing held in July 2006, this court required the defendants to produce responsive documents pertaining to sexual misconduct allegations involving several clerics between 1992 and 1998.  (Docket Entry Nos. 81, 85, 86).  Many of the certified questions dealt with allegations of misconduct against other clergy members that were made long before or after these dates.

In Monsignor Rossi's deposition, the plaintiffs asked how many complaints of sexual misconduct involving clerics he had received between 1986 and 2002; the names of two clerics of the Diocese of Galveston–Houston for whom he had received complaints of sexual misconduct; the identity of a priest whose information was sent to the "Congregation for the Doctrine of Faith" for a petition for laicization of the priest; whether any allegations of sexual misconduct had been reported to the police; how many clerics had been dismissed for general sexual misconduct; how many affidavits Monsignor Rossi had produced involving sexual misconduct allegations against clerics; the identity of a cleric accused of sexual abuse whom Bishop Fiorenza had referred for a canonical trial; and specifics about the complaint against one of the four clergy members accused during the period between 1992 and 1998.  (Docket Entry No. 101, Ex. D, Certified Questions 1–7, 12, 14).

In Bishop Fiorenza's deposition, plaintiffs' counsel asked how many foreign seminarians had been accused of misconduct; how many "sustainable accusations" had come forward since 1988; how many clerics accused of sexual misconduct were sent a particular facility for treatment or evaluation of pedophilia; whether clerics accused of sexual misconduct were sent to other facilities; how many other investigations into such accusations Bishop Fiorenza had participated in; the identities of other accused clerics; and the outcomes of certain accusations. (Docket Entry No. 101, Ex. C, Certified Questions 1–17, 19, 30–33, 38). On instruction of counsel, Bishop Fiorenza refused to answer questions that addressed allegations of abuse outside the period previously identified by this court. (*Id.*, Certified Questions 18, 20–27).

The plaintiffs have not shown a specific basis for requiring the additional information they seek. They did not ask this court for a continuance under Rule 56(f) to obtain additional information before responding to the defendants' summary judgment motion. The plaintiffs obtained and submitted a significant amount of information responsive to the certified questions from sources other than the deponents. Based on the present record, the motion to compel further responses to the certified questions about accusations against clerics during periods long before or after 1992 to 1998 is denied.

Plaintiffs' counsel also moved to compel answers to questions about the three clerics accused of sexually abusing minors during the relevant period. In Bishop Fiorenza and Monsignor Rossi's depositions, plaintiffs' counsel asked for many details about the three clerics identified as JL, DL, and RB. The defendants produced portions of their files about

72

these three clerics.  The deposition questions either went far beyond the portions of the files that the court ordered produced or the questions were irrelevant.  For example, the plaintiffs asked about locations of facilities where these accused clerics were treated.  (Docket Entry No. 101, Ex. D, Certified Questions 16 - 19, Ex. C, Certified Questions 29, 36–37).  The plaintiffs have failed to show why this information is relevant and why further answers should be compelled.

The plaintiffs have shown a basis to compel further information as to one area of questionning.  The plaintiffs asked Monsignor Rossi asked whether the accusations in the cases involving other clerics and seminarians between 1992 to 1998 were reported to the police.  (Docket Entry No. 101, Ex. D, Certified Question 4).  The motion to compel further answers to these questions is granted.

The plaintiffs also move to compel answers to questions about the names of individuals involved in the allegations of abuse against other clerics and seminarians, including their lawyers and their treating doctors.  The names of the clerics were redacted in the documents that the Archdiocese Defendants produced.  (Docket Entry No. 101, Ex.C, Certified Questions 28, 34; *id.*, Ex. D, Certified Questions 9–15).  The plaintiffs have not shown a basis to compel additional discovery responses.  Their summary judgment exhibits show that they already have much of the information they seek to obtain here.  The plaintiffs' motion is denied as to these questions.

Finally, the plaintiffs seek to compel answers to questions that were objected to on the basis of privilege.   In Bishop Fiorenza's deposition, plaintiffs' counsel asked what

instructions he had given his attorneys.  A similar question was asked of Father Tiemann. (Docket Entry No. 101, Ex. C, Certified Question 35; Ex. D, Certified Question 1).  The information sought is privileged and, as to the question asked of Father Tiemann, irrelevant. The motion to compel further responses to these questions is denied.

## VIII.  The Plaintiffs' Motion for a Scheduling Conference

The plaintiffs have asked this court to set a scheduling conference.  (Docket Entry No. 110).  The defendants opposed the motion, arguing that a scheduling order will be unnecessary if this case is dismissed on summary judgment.  (Docket Entry No. 113).

Because this court's rulings on the summary judgment motion has not resolved all the issues, a scheduling conference is appropriate.  At that conference, the parties should be prepared to discuss the remaining issues and propose a timetable for remaining pretrial work necessary to resolve them and for the trial.  The parties should also be prepared to address one other issue.

Under 28 U.S.C. § 1367(c)(3), when federal law claims that serve as the basis of subject matter jurisdiction are dismissed and only state law claims remain, a district court has broad discretion to dismiss the state law claims without prejudice to permit them to proceed in state court.[31]  *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350–52 (1988); *see also*

---

[31]      28 U.S.C. § 1367(c) provides that:

[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

*Brown v. Southwestern Bell Telephone Co.*, 901 F.2d 1250, 1254 (5th Cir. 1990) ("[T]he decision as to whether to retain the pendent claims is within the sound discretion of the district court.").   A court considering whether to continue to exercise supplemental jurisdiction over such state law claims must consider the provisions of section 1367(c) and the factors the Supreme Court outlined in *Cohill*, 484 U.S. at 350–51, and *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). *See also Smith v. Amedisys Inc*., 298 F.3d 434, 447 (5th Cir. 2002).  Those factors include judicial economy, convenience, fairness, and comity. *Id.*; *see also Jones v. Adam's Mark Hotel*, 840 F. Supp. 66, 69 (S.D. Tex. 1993). The "general rule" is to decline to exercise jurisdiction over pendent state-law claims when all federal claims are eliminated from a case before trial. *Amedisys*, 298 F. 3d at 447–48 (citing *Batiste v. Island Records Inc.*, 179 F.3d 217, 227 (5th Cir. 1999)).  This rule is neither mandatory nor absolute. *Id.; see generally Sibley v. LeMaire*, 184 F.3d 481, 490 (5th Cir. 1999) (affirming the district court's decision to decline jurisdiction over the plaintiff's remaining state law claims after dismissing the plaintiff's sole federal claim, asserted under section 1983, and noting that although the federal court had engaged in lengthy summary judgment proceedings, "there remained the need for a full-blown jury trial" on the remaining state claims and finding no abuse of discretion in the "district court's decision not to conduct that trial in federal court."); *Amedisys*, 298 F.3d at 447 (affirming the district court's decision

---

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

75

to retain jurisdiction over the plaintiff's remaining state law claims after dismissing the plaintiff's Title VII claims; noting that the remaining claims did not involve "novel or complex" issues of state law, there were no "exceptional circumstances" for refusing to retain jurisdiction, and the district court had "devoted many hours" in reaching the decisions in its "comprehensive summary judgment ruling" and had "substantial familiarity with the merits of the case"; and concluding that with the section 1367(c) factors in equipoise, the factors of judicial economy, convenience, fairness, and comity "weigh[ed] heavily toward retaining jurisdiction.") (quoting *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 587 (5th Cir. 1992)); *Batiste*, 179 F.3d at 227–28 (the Fifth Circuit concluded that the district court had abused its discretion in declining jurisdiction over pendent state law claims after entering summary judgment on all the plaintiffs' other claims, noting that the court was familiar with the claims and they did not involve "novel or complex" issues of state law, so that the factors of judicial economy, convenience, and fairness to the parties strongly weighed in favor of retaining jurisdiction).

The parties did not ask this court to remand the case when it dismissed the basis for federal removal jurisdiction.  It is, however, appropriate for this federal court to consider whether it should retain jurisdiction over the state-law claims that remain to be tried.  At the status conference, the parties should be prepared to discuss this issue as well.

The status conference is set for **October 10, 2007**, in Courtroom 11-B, 515 Rusk St., Houston, Texas, at **1:30 p.m.**

## IX.    Conclusion and Order

The defendants' motion for summary judgment is granted in part and denied in part. (Docket Entry No. 98).  The plaintiffs' motion to compel is denied except as to one area of questioning.  (Docket Entry No. 101).  The plaintiffs' motion for a pretrial conference is granted.  (Docket Entry No. 110).  That conference is set for **October 10, 2007, at 1:30 p.m.**

SIGNED on September 26, 2007, at Houston, Texas.

Lee H. Rosenthal
United States District Judge